**SOUTH CREEK ASSOCIATES, a Colorado general partnership, Petitioner,**

v.

**BIXBY & ASSOCIATES, INC., a Colorado corporation, d/b/a Bixby Day School, Respondent.**

No. 88SC62.

Supreme Court of Colorado, En Banc.

Oct. 23, 1989.

Berenbaum & Weinshienk, P.C., Barry M. Permut, James L. Kurtz–Phelan and Amy Therese Loper, Denver, for petitioner.

Martin & Mehaffy, Joel C. Maguire, Boulder, for respondent.

Office of the Boulder City Atty., Joseph N. de Raismes and Jane W. Greenfield, Boulder, for amicus curiae City of Boulder in support of Bixby Day School.

Justice LOHR delivered the Opinion of the Court.

South Creek Associates (South Creek), a general partnership which owns a shopping center in Boulder, Colorado, filed a quiet title action in Boulder County District Court seeking a judgment that Bixby & Associates, Inc. (Bixby), an adjoining landowner which is the operator of a private day school, has no right to use South Creek's parking lot. Bixby claims a right to use the parking lot based on the provisions of a planned unit development (PUD) application submitted by McStain Enterprises, Inc. (McStain), the original owner and developer of both parcels involved in the present dispute, and approved by the City of Boulder planning board. South Creek and Bixby filed cross-motions for summary judgment. The district court granted Bixby's motion, denied South Creek's motion, and held that Bixby is entitled to use the South Creek parking lot based on the provisions of the approved PUD plan. South Creek appealed,[1] and a

---

1. The complaint filed by South Creek includes additional claims and names additional parties.

The trial court directed entry of final judgment on the claim upon which summary judgment

divided panel of the Colorado Court of Appeals affirmed the district court's judgment. *South Creek Assoc. v. Bixby & Assoc., Inc.,* 753 P.2d 785 (Colo.App.1987). We granted certiorari, and we now affirm the judgment of the court of appeals.

## I.

In 1977, McStain filed an application[2] with the City of Boulder planning department to develop land owned by McStain as a planned unit development to be called South Creek Village. The PUD plan proposed the development of a residential area, a shopping center, and a private school for South Creek Village. The plan was submitted pursuant to Boulder's planned unit development ordinance. Boulder Municipal Code §§ 37–501 to 37–513 (1965).[3]

The South Creek Village PUD plan contained two statements regarding the use of the parking facilities presently at issue. In the "Guidelines for School Site," the plan stated that "[s]ix [parking] spaces will be provided on site for the exclusive use of school personnel. In addition, the adjacent parking lot will be available for the mutual use of the school and the commercial facility." Next, in the "Guidelines for Neighborhood Center," the plan provided that "[t]he parking on the southeast portion of the site is intended for the mutual use of

the school and the shopping center tenants."

The City of Boulder planning board approved McStain's South Creek Village PUD application in December 1977.[4] This approval was subject to seven conditions regarding such items as landscaping, open space, bus service, road completion, recording appropriate covenants prior to subdivision, and submitting a list of proposed tenants for review and approval. None of the seven conditions addressed the parking provisions of the plan. Although the PUD plan was a matter of public record available from the City of Boulder, the plan was never recorded in the county clerk and recorder's office. *See* § 38–35–109(1), 16A C.R.S. (1988 Supp.) (any deed or other written instrument affecting title to real property may be recorded in county clerk and recorder's office in the county where the property is located).

In April 1978, McStain entered into a subdivision agreement with the City of Boulder allowing for the subdivision of South Creek Village. This subdivision agreement was recorded in the county clerk and recorder's office, and it stated that "development of this subdivision is controlled by an approved Planned Unit Development (P77–5) approved by the Planning Board with conditions on December 1, 1977, in addition to the City Land Use and

---

was granted based on its determination that there was no just reason for delay. Accordingly, the judgment on this claim is final for purposes of appeal. *See* C.R.C.P. 54(b).

**2.** As far as can be determined from the record, the application consisted of a single sixteen-page document, including exhibits.

**3.** The current version of Boulder's PUD ordinance is codified in the Boulder Revised Code §§ 9–4–1 to 9–4–14 (1981).

The legislature has also addressed the issue of PUD regulation and approval in the Planned Unit Development Act of 1972, §§ 24–67–101 to 24–67–108, 10B C.R.S. (1988) (PUD Act). However, Boulder is a home rule city, and its ordinance provisions supersede any conflicting state statutes in matters of exclusively local concern. In matters of mixed local and statewide concern, a home rule city's ordinance provisions control unless superseded by conflicting state statutes. In matters of exclusively statewide

concern, a state statute supersedes any conflicting provisions of a home rule city's ordinances. *National Advertising Co. v. Department of Highways,* 751 P.2d 632, 635 (Colo.1988). In view of the manner in which we resolve this case, it is unnecessary to decide the extent to which Boulder's PUD ordinance addresses a matter of exclusively local concern and may supersede conflicting provisions, if any, of the PUD Act. *See* section IID below.

**4.** Under the provisions of the Boulder PUD ordinance then in effect, the city council could call up for review any PUD application approved by the planning board within fourteen days of the approval. Boulder Municipal Code § 37–505(e) (1965). In this case, the city council did not seek to review McStain's application, and the planning board's approval thus became final upon the expiration of the call-up period. *See* Boulder Rev.Code § 9–4–3 (1988) (current PUD ordinance providing that planning board decision not called up by city council is final twenty-one days after date of decision).

Zoning Regulations." The agreement also provided that McStain "promises to meet and complete all conditions as stated on the P.U.D." and that "[a]ll improvements shall be completed in accordance with the plans as approved." Nothing in this recorded subdivision agreement specifically referred to the parking provisions of the PUD plan. Pursuant to Boulder's subdivision regulations, a subdivision plat was presented to and approved by the Boulder city council. The plan showed numerous easements, but it contained no reference to any use of the South Creek parking facility in connection with the operation of the private school. The plat was recorded in the office of the county clerk and recorder.

Following the PUD approval in 1977, McStain constructed the private school proposed in the plan. In the summer of 1978, McStain conveyed the school property to Bixby.[5] The deed granted Bixby a non-exclusive easement for ingress and egress over other South Creek Village property in order to provide access to and from the school, but it did not grant any easement for parking in the South Creek lot, nor did it mention any parking rights or privileges of Bixby under the PUD plan. This deed was recorded in the Boulder County clerk and recorder's office. Bixby commenced operation of the Bixby Day School on the deeded property in 1978.

In the meantime, McStain completed construction of the South Creek Village Shopping Center commercial facilities provided for in the PUD. After completion, McStain conveyed title to the South Creek Village Shopping Center to The South Creek Venture Company, a limited partnership in which certain former principals in McStain were general partners. In May 1982, the limited partnership conveyed the South Creek Village Shopping Center to the petitioner, South Creek, by a warranty deed that was recorded in the Boulder County clerk and recorder's office. The deed conveyed the shopping center property subject to several easements and encumbrances listed in an exhibit attached to the deed. Among the encumbrances listed was the recorded subdivision agreement between McStain and the City of Boulder. However, there was no reference in the deed or the attached exhibit to the approved PUD plan or to Bixby's right or privilege to the nonexclusive use of the South Creek parking lot.

Between 1978 and 1983, Bixby's employees and the parents of children attending the Bixby Day School used the South Creek parking lot at issue in this case. In the fall of 1983, however, South Creek began objecting to the use of the parking lot by individuals from the school. In 1984, South Creek filed the present quiet title action in Boulder County District Court alleging that the Bixby Day School had no right to use South Creek's parking lot. South Creek filed a motion for summary judgment. In support of its motion, South Creek averred that it had no actual knowledge of Bixby's asserted parking right on South Creek's parking lot at the time it acquired the shopping center. South Creek also contended that Colorado's recording statutes, §§ 38–35–108 to 38–35–109, 16A C.R.S. (1982), protected South Creek from any claim by Bixby to use South Creek's lot because there was no recorded instrument granting Bixby a right to use the lot. Thus, South Creek argued, it had no constructive notice of the parking right claimed by Bixby. South Creek further argued that the statements in the PUD plan were insufficient to create any rights in Bixby to use the lot because the plan was merely a guideline without any legal effect.

Bixby filed a cross-motion for summary judgment. In support of its motion, Bixby argued that the PUD plan provided for Bixby's use of the South Creek lot and that South Creek was bound by these plan provisions. Bixby also argued that South Creek was put on notice of the parking

---

**5.** The grantee named in the deed is Mathilda Bartram, the mother of Bixby's president. Although the record contains no explanation of the designation of Bartram as grantee, the parties do not dispute that Bartram took title on behalf of and for the benefit of Bixby. We assume that the effect of the deed was the same as if Bixby had been designated the grantee— the same assumption on which the parties have briefed and argued the case.

provisions of the plan because South Creek's deed referred to the recorded subdivision agreement between McStain and the City of Boulder which in turn referred to the approved PUD plan controlling the development of South Creek Village.

The district court ruled that summary judgment was appropriate because there were no genuine issues of material fact. The district court held that approval of a PUD constitutes rezoning of the area within the PUD and that subsequent uses of the area must be in accordance with the provisions of the PUD plan. Additionally, the district court concluded that South Creek had constructive notice of the PUD plan because a purchaser is deemed to have knowledge of the provisions of a PUD just as he is deemed to have knowledge of applicable zoning laws. Finally, the court held that South Creek also had notice of the unrecorded PUD provisions because the recorded subdivision agreement referenced in South Creek's deed referred to the PUD plan. Accordingly, the district court granted Bixby's motion for summary judgment and denied South Creek's motion for summary judgment on the claim at issue here.

South Creek appealed, and the Colorado Court of Appeals affirmed the district court's judgment. *South Creek Assoc. v. Bixby & Assoc., Inc.*, 753 P.2d 785 (Colo. App.1987). The court of appeals relied on reasoning similar to that applied by the district court. First, the court of appeals held that the reference to the subdivision agreement in South Creek's recorded deed, and the further reference to the PUD in the subdivision agreement, were sufficient to put South Creek on notice of the PUD. "[O]nce having been put on notice, it was incumbent upon [South Creek] to peruse the provisions of the P.U.D. which contained the[ ] parking restrictions." 753 P.2d at 787. Secondly, the court of appeals held that the approved PUD plan was in effect a rezoning of the area restricting the use of the land to the provisions of the plan. *Id.* Thus, the court of appeals concluded, Bixby was entitled to enforce the parking provisions of the plan against South Creek.

Judge Van Cise dissented to the opinion of the court of appeals. The dissenting opinion expressed the view that the statements in the PUD plan were insufficient to create any "parking easement or license" in Bixby because the statements did not contain operative words of present conveyance sufficiently describing the property or interest transferred. *South Creek*, 753 P.2d at 788–89 (Van Cise, J., dissenting). Next, the dissent concluded that the Colorado recording statutes precluded Bixby from relying on the parking provisions in the PUD plan because neither the plan nor the parking provisions were ever recorded. *Id.* at 789–90. Because the PUD plan was unrecorded, the dissent reasoned that under section 38–35–108 South Creek had no duty of inquiry with regard to this unrecorded instrument and thus South Creek had no inquiry notice of the PUD plan. Furthermore, the dissent concluded that the PUD plan could not be equivalent to a rezoning since it had not been approved by the city council. Lastly, the dissent asserted that section 24–67–106(2) of the Planned Unit Development Act of 1972, §§ 24–67–101 to 24–67–108, 10B C.R.S. (1988) (PUD Act), requires that PUD plan provisions be recorded in order to be enforceable. *Id.* at 790.

## II.

This case presents a question of first impression in Colorado: whether PUD plan provisions must be recorded in order to be enforceable against a subsequent purchaser of land within a PUD. We conclude that the parking provisions contained in the PUD plan need not have been recorded to be enforceable against South Creek.

## A.

A planned unit development "allows [a] municipality to control the development of individual tracts of land by specifying the permissible form of development in accordance with the city's PUD ordinance." *Tri-State Generation and Transmission Co. v. City of Thornton*, 647 P.2d 670, 677 (Colo.1982); *see generally* 2 R. Anderson, *American Law of Zoning 3d* § 11.12

(1986). The planned unit development process provides more flexibility to municipalities than does traditional Euclidean zoning. *Tri–State,* 647 P.2d at 677. We have previously held that a properly drafted PUD ordinance is constitutionally permissible. *See id.* at 678.

In the present case, the South Creek Village PUD application was submitted, reviewed, and approved pursuant to Boulder's PUD ordinance. The current version of the Boulder ordinance provides that any proposal to modify an approved PUD in other than a minor way requires additional approval by the city. Boulder Rev.Code § 9–4–12(j)(2) (1987).[6] The provisions of the approved PUD plan may be enforced by public or private actions to remedy violations of the plan. Boulder Rev.Code §§ 9–10–4 to 9–10–7 (1984); *see Tri–State,* 647 P.2d at 681 (under analogous Thornton PUD ordinance, "the only uses permitted in a PUD district are those prescribed in the approved development plan"); *Frankland v. City of Lake Oswego,* 267 Or. 452, 517 P.2d 1042, 1048 (1973) (in order to secure benefits of PUD, once PUD plan is approved "the developer should be bound by the plan[ ] unless any changes are approved by the planning authorities in accordance with the PUD ordinance").

### B.

South Creek has not challenged the validity of the Boulder PUD ordinance or the approval of the South Creek Village PUD plan in the present case. Additionally, South Creek concedes that Boulder has the authority to impose parking restrictions as a provision of a PUD. *See Tri–State,* 647 P.2d at 681 (parking requirements are independent elements of PUD plan that must be considered as part of the use of land within a PUD); *cf. Beaver Meadows v. Board of County Comm'rs,* 709 P.2d 928, 935, 938–39 (Colo.1985) (counties have authority to adopt regulations requiring developer to provide off-site access road and

emergency medical services as condition to approval of PUD in rural area); *Bethlehem Evangelical Lutheran Church v. City of Lakewood,* 626 P.2d 668, 671 (Colo.1981) (city may condition issuance of building permit on requirement that developer make street improvements and dedicate certain land to city for public use). South Creek's primary contention here is that the parking provisions contained in the PUD are not enforceable against it because it purchased the property without knowledge or notice of the provisions. We disagree with South Creek's argument, and conclude that Colorado's recording act does not apply to the parking provisions of the PUD plan because the plan constitutes a form of rezoning for the area within the PUD and was validly adopted pursuant to Boulder's PUD ordinance, which in turn was validly enacted in exercise of Boulder's police power.

### 1.

■ South Creek first argues that it is protected by Colorado's recording statutes because neither the PUD plan nor the parking provisions were recorded in the county clerk and recorder's office. Section 38–35–109(1) provides in pertinent part that:

All deeds, powers of attorney, agreements, or other instruments in writing conveying, encumbering, or affecting the title to real property, certificates, and certified copies of orders, judgments, and decrees of courts of record may be recorded in the office of the county clerk and recorder of the county where such real property is situated, and no such instrument or document shall be valid as against any class of persons with any kind of rights, except between the parties thereto and such as have notice thereof, until the same is deposited with such county clerk and recorder.

§ 38–35–109(1), 16A C.R.S. (1982).[7]

Under this section, an unrecorded instrument affecting the title to real property

---

6. The version of Boulder's PUD ordinance in effect at the time of the approval of the South Creek Village PUD contained similar provisions. *See* Boulder Municipal Code § 37–510 (1965).

7. This section was amended in 1984. *See* § 38–35–109(1) (1988 Supp.). However, the amended version is inapplicable to the present case because it applies only to instruments re-

binds only the parties to the document and those who have notice of the instrument. South Creek argues that the PUD plan provisions regarding the use of the parking lot constitute an unrecorded instrument affecting South Creek's title to the parking lot. This argument requires us to determine whether a PUD plan is an instrument to which the requirements of the recording act apply.

### 2.

A PUD enabling ordinance is a legislative enactment. *Tri–State*, 647 P.2d at 677; *Sundance Hills Homeowners Association v. Board of County Commissioners*, 188 Colo. 321, 329, 534 P.2d 1212, 1217 (1975). A PUD plan adopted and approved pursuant to such an ordinance constitutes a form of rezoning for the area included within the PUD. *See* Boulder Rev.Code § 9–4–12(a) (1987) (PUD is modification of development standards applicable to planned unit); *Dillon Companies, Inc. v. City of Boulder*, 183 Colo. 117, 121–22, 515 P.2d 627, 629 (1973) (PUD ordinances usually, in effect, provide for rezoning of relatively small area within large zoned area); *Moore v. City of Boulder*, 29 Colo. App. 248, 251, 484 P.2d 134, 135 (1971) (PUD is type of rezoning of area); *see also Nesbit v. City of Albuquerque*, 91 N.M. 455, 575 P.2d 1340, 1343 (1977) (approval of PUD plan constitutes zoning restriction).[8] We have never before had occasion to determine whether a PUD plan must be recorded in order to be enforceable against a subsequent purchaser of land within the PUD. Because PUD plans have their source in public approval processes prescribed in legislative enabling enactments, we are persuaded that recordation of PUD plans is not required by the recording act to make them enforceable against subsequent purchasers.

One important purpose served by recording acts such as section 38–35–109(1) is to "provide protection for purchasers of real property against the risk of prior secret conveyances by the seller." *Page v. Fees–Krey, Inc.*, 617 P.2d 1188, 1193 (Colo.1980). Recording acts also promote prompt recordation and the creation of an accessible history of title which provides notice to subsequent purchasers concerning all instruments affecting title to the property. *Id.* at 1193 & n. 7.

Our previous decisions construing Colorado's recording act and determining its applicability have uniformly dealt with private transactions affecting the title to real property. *E.g., Page v. Fees–Krey, Inc.*, 617 P.2d 1188 (Colo.1980) (private transaction creating overriding royalty interest in oil and gas lease); *Cohen v. Thomas & Son Transfer Line, Inc.*, 196 Colo. 386, 586 P.2d 39 (1978) (private transaction involving sale of property subject to unrecorded lease); *Austin v. Stephen*, 89 Colo. 177, 300 P. 364 (1931) (private joint venture agreement affecting title to real property); *Salisbury v. La Fitte*, 57 Colo. 358, 141 P. 484 (1914) (private contract for future conveyance of real property).

By contrast, the parking provisions of the PUD plan at issue here have their ultimate source in an enabling ordinance adopted through a valid exercise of Boulder's police power. Boulder has exercised its police power by adopting a PUD enabling ordinance that ensures that the public interest in pedestrian safety, traffic control and uncongested streets will be satisfied by requiring a PUD applicant to provide adequate parking facilities for the users of the improvements comprising the PUD. Boulder Rev.Code § 9–4–12(d)(2)(D); *see Tri–State*, 647 P.2d at 681 (parking facilities constitute an independent element of PUD plan); *Stroud v. City of Aspen*, 188 Colo. 1, 532 P.2d 720 (1975) (upholding offstreet parking requirements in municipal zoning law); 5 E. Ziegler, *Rathkopf's The Law of Zoning and Planning* § 58.01

---

corded on or after July 1, 1984. *See* Ch. 267, sec. 2, 1984 Colo.Sess.Laws 979, 979.

**8.** Although the enactment of a PUD enabling ordinance is a legislative function, the process of reviewing a particular PUD plan for approval is "administrative or adjudicative in nature," and therefore proper for review under C.R.C.P. 106(a)(4). *Dillon Companies*, 183 Colo. at 122, 515 P.2d at 630.

(1985) (discussing need for and validity of off-street parking requirements in municipal zoning regulations); *cf. Bethlehem Evangelical Lutheran Church v. City of Lakewood,* 626 P.2d 668, 673 (Colo.1981) (valid exercise of police power may result in "non-compensatory reasonable restrictions in respect to private [property] interests which must yield to the public interest"). In furtherance of Boulder's public interest, the PUD plan at issue here imposed specific requirements to provide adequate parking for the school that is part of the approved PUD. Pursuant to Boulder's PUD ordinance, any violation of those provisions may be enforced not only by Boulder but by interested private parties. *See* Boulder Rev.Code §§ 9–10–4(a), 9–10–7 (1984).[9]

Unlike the private transactions reviewed in our previous recording act decisions, the PUD plan provisions here are binding upon all members of the public because the PUD plan approval was obtained pursuant to a PUD ordinance adopted as a valid exercise of Boulder's police power through its zoning authority.[10] *See* Boulder Rev.Code §§ 9–10–4(a), 9–10–7 (1984) (provisions of approved PUD plan may be enforced by public or private actions to remedy violations of plan); *Tri–State,* 647 P.2d at 681 (under analogous Thornton PUD ordinance, "only uses permitted in a PUD district are those prescribed in the approved development plan"); *cf. Magruder v. Redwood City,* 203 Cal. 665, 265 P. 806, 810 (1928) ("[zoning] ordinance of a municipality when once legally adopted becomes binding upon all the citizens thereof").

The public nature of the PUD plan provisions at issue here precludes the need for any recordation of the plan provisions in order to provide notice to subsequent purchasers. Because the PUD plan is equivalent to a rezoning provision approved pursuant to the public process prescribed by Boulder's PUD ordinance, subsequent purchasers as well as other members of the public are bound by the plan provisions. *See Mitchell v. Chernecki,* 286 Or. 285, 593 P.2d 1163, 1165–66 (1979) (purchaser of real property is charged with notice of zoning provisions that affect such property); *cf.* Annotation, *Zoning or Other Public Restrictions on the Use of Property as Affecting Rights and Remedies of Parties to Contract for the Sale Thereof,* 39 A.L. R.3d 362, 370–73 (1971 & 1988 Supp.) (discussing cases holding a purchaser bound by a contract to purchase land despite lack of actual knowledge of restrictive zoning ordinances). In the instant case, the PUD plan was approved at a public hearing and the approved plan was a matter of public record available from the City of Boulder. These characteristics of the approved PUD plan, together with its nature as a revision of the previously applicable zoning, are sufficient to persuade us that the recording act should not apply in this case. The public nature of the PUD approval and Boulder's PUD authority provides an adequate safeguard against the problem of secret conveyances that recording acts have been adopted to remedy. We conclude that a recording of the PUD plan provisions under the recording act is not required because the notice goals of the recording act are satisfied by the PUD approval process. Accordingly, we hold

---

9. South Creek's argument that it is not bound by the unrecorded PUD plan implies that Boulder could not enforce the parking provisions either. If carried to its logical extreme, South Creek's argument suggests that a city could never enforce provisions of an unrecorded PUD against a subsequent purchaser no matter how essential to public safety and welfare those provisions might be. South Creek, however, has obtained the benefits of the PUD plan in the form of modification of pre-existing zoning and should not be permitted to reject the parts of the plan that it may find burdensome. *Cf. Page v. Fees-Krey, Inc.,* 617 P.2d 1188 (Colo.1980) (owner of oil and gas lease held bound by reservation of overriding royalty in unrecorded assignment of lease in owner's chain of title).

10. Because South Creek has not challenged the validity of Boulder's PUD ordinance or the PUD plan approval in this case, we may assume that the ordinance was validly enacted and the plan was validly approved. ·*See Tri–State,* 647 P.2d at 677 (PUD enabling ordinance is "a legislative enactment and is presumed valid"); 4 R. Anderson, *American Law of Zoning 3d* § 30.14 (1986) (zoning ordinances, amendments, and changes "enjoy a strong presumption of validity").

that the PUD plan at issue here is not an instrument affecting title to real property within the purview of section 38–35–109(1).[11]

### C.

Next, South Creek contends that the statements contained in the PUD plan regarding parking for the school are insufficient to create any interest in Bixby to use the South Creek lot. Additionally, South Creek argues that Bixby acquired no parking rights because Boulder never acted to implement the parking provisions of the PUD. We disagree with South Creek's contentions.

### 1.

■ South Creek relies on *Harrison v. Everett*, 135 Colo. 55, 308 P.2d 216 (1957), and *Lambert v. Murray*, 52 Colo. 156, 120 P. 415 (1911), to support its argument that the statements in the PUD plan were insufficient to create any parking right or privilege in Bixby. However, neither of these cases is dispositive of the issues presented here. Both *Harrison* and *Lambert* concern challenges to the sufficiency of deeds transferring title to real property. Neither case considers whether an enforceable right may be created by provisions contained in an approved PUD plan.

The traditional rules of land conveyancing relied on by South Creek do not apply to the present case because the parking restrictions did not arise out of a private transaction. Instead, the parking provisions of the PUD plan have their ultimate source in an enabling ordinance adopted through a valid exercise of Boulder's police power. *See* section IIB2 above.

The parking provisions relied on by Bixby are contained in a PUD plan approved pursuant to the applicable Boulder municipal ordinance. The PUD plan specifically provides that "[t]he parking on the southeast portion of the site is intended for the mutual use of the school and the shopping

center tenants" and that the parking lot adjacent to the school "will be available for the mutual use of the school and the commercial facility." This language in the PUD plan clearly indicates that the South Creek lot was designed for the mutual use of the school and the shopping center. Only those uses consistent with the approved PUD plan are allowed under the Boulder ordinance, and any violation of the approved PUD plan is enforceable by the City of Boulder or any person injured by the violation. Boulder Rev.Code §§ 9–10–4 to 9–10–7 (1984). Therefore, because the Boulder ordinance provides that injured persons may enforce violations of the PUD plan, and because the parking provisions in the approved PUD plan have their ultimate source in a valid exercise of Boulder's police power, we conclude that the PUD parking provisions were sufficient to create in Bixby an enforceable right to the nonexclusive use of the South Creek parking lot.

### 2.

■ South Creek also contends that Boulder never acted to implement the parking provisions of the PUD. However, South Creek has not cited any authority to support its position that Boulder, as the approving municipality, must take some action in addition to approving the PUD proposal in order to implement the provisions contained in a PUD plan. Nothing in the Boulder PUD ordinance and none of our previous decisions interpreting PUDs suggest that any additional action is required. Once adopted, the PUD plan guides the development of the area in the PUD, and only those uses prescribed in the approved plan are permitted in the PUD. *See Tri-State*, 647 P.2d at 681. Because the parking provisions were contained in the approved PUD plan in this instance, the provisions constitute an enforceable part of the plan and no action in addition to approval of the PUD plan and application is required to implement those provisions.

---

**11.** Because we conclude that the PUD plan is not an instrument affecting title to real property within the purview of the recording act, we

need not address South Creek's contention that, pursuant to section 38–35–108, it had no duty of inquiry regarding the PUD plan provisions.

### D.

Lastly, South Creek argues that the enforcement provisions of the PUD Act, § 24–67–106(2), 10B C.R.S. (1988), specify that only those PUD plan provisions that have been recorded may be enforced.[12] We need not consider the effect of the language relied on by South Creek, however, because we determine that by its own terms the PUD Act is inapplicable to the instant case.

Section 24–67–107 addresses the applicability of the PUD Act. Section 24–67–107(1) provides that the PUD Act "shall apply to home rule municipalities unless superseded by charter or ordinance enactment." In the present case, Boulder is a home rule city and its PUD ordinance supersedes the PUD Act under section 24–67–107(1). Moreover, section 24–67–107(2) provides that

Any county or municipality which has enacted, prior to May 21, 1972, a resolution or ordinance providing for planned unit developments *may continue to follow the provisions established therein, and any amendments thereto in lieu of electing to follow the provisions of this article.*

(Emphasis added.) Here, Boulder's PUD ordinance was originally enacted prior to May 21, 1972. *See Moore v. City of Boulder*, 29 Colo.App. 248, 484 P.2d 134 (1971) (describing Boulder PUD ordinance then in effect). Because Boulder's PUD ordinance was originally enacted prior to May 21, 1972, section 24–67–107(2) clearly provides that Boulder may continue to follow its own ordinance provisions in lieu of the provisions of the PUD Act. Boulder has continued to amend and follow its own PUD ordinance, which contains its own enforcement provisions. *See* Boulder Rev.Code §§ 9–4–1 to 9–4–14 (1981) (current version of Boulder PUD ordinance and amend-

ments); Boulder Rev.Code §§ 9–10–1 to 9–10–9 (land use regulation enforcement provisions). Accordingly, by its own terms the PUD Act does not apply to Boulder's regulation of PUDs, and we thus need not consider South Creek's argument that section 24–67–106(2) of the PUD Act specifies that only those PUD plan provisions that are recorded may be enforced.

### III.

In summary, we conclude that the Colorado recording statutes do not apply to PUD plans. We also hold that the PUD parking provisions together with the Boulder PUD ordinance were sufficient to create in Bixby an enforceable right to the nonexclusive use of the South Creek parking lot. Lastly, we conclude that the PUD Act does not apply because Boulder had adopted its own PUD ordinance prior to the enactment of the PUD Act and continued to follow that ordinance. Accordingly, we affirm the judgment of the court of appeals.

VOLLACK, J., dissents.

VOLLACK, Justice, dissenting:

I respectfully dissent from the majority's holding that the public nature of PUD plan provisions precludes the need for any recordation of the plan provisions in order to provide notice to subsequent purchasers. At 1033. I believe PUD plans are not legislative ordinances. The approval of PUD plans is a quasi-judicial act which does not provide to subsequent purchasers the notice contemplated by the recording statute.

### I.

This case involves the effect of approved PUD plan provisions on the property rights of private parties. The PUD application

---

12. Section 24–67–106(2) provides:
   All provisions of the plan shall run in favor of the residents, occupants, and owners of the planned unit development, but only to the extent expressly provided in the plan and in accordance with the terms of the plan, and, to that extent, said provisions, whether recorded by plat, covenant, easement, or otherwise, may be enforced at law or in equity by residents, occupants, or owners acting individually, jointly, or through an organization designated in the plan to act on their behalf. However, no provisions of the plan shall be implied to exist in favor of residents, occupants, and owners except as to those portions of the plan which have been finally approved.

submitted by McStain Enterprises, Inc. (McStain) contained two sentences expressing McStain's intent to allow the private school to use the South Creek Village Shopping Center parking lot. McStain conveyed title to the shopping center to South Creek Venture Company (South Creek Venture), which later conveyed title to the shopping center to South Creek Associates (South Creek). South Creek Venture's conveyance to South Creek was by a recorded warranty deed which contained easements for automobile parking and automobile and pedestrian ingress and egress over various parking lots in the development. The deed did not grant to Bixby & Associates, Inc. (Bixby), owner of the private school at the time, an easement or license to use the shopping center parking lot. Bixby now relies on the statements of intent in the PUD plan application to enforce what it did not receive in the warranty deed, namely an easement to use the South Creek Village parking lot. Since the PUD plan provisions were not recorded, South Creek took the shopping center property without notice of any claim by Bixby to use of the parking lot. I would hold that approved PUD plan provisions do not provide notice to subsequent purchasers where a third party attempts to enforce against the purchaser what is essentially an interest in property. The statements of intent in the PUD plan in this case were insufficient to convey to the private school an easement or license to use the shopping center parking lot.

## II.

As the majority notes, previous cases arising under the recording act have involved private parties. At 1032. By contrast, PUDs were developed to advance the public interest. PUDs were generally developed to eliminate the drawbacks of rigid Euclidian zoning. Krasnowiecki, *Planned Unit Development: A Challenge to Established Theory and Practice of Land Use Control*, 114 U.Pa.L.Rev. 47 (1965). Municipalities have typically approved planned unit developments to reduce problems associated with growth and to achieve objectives sought by the city. *Dillon Companies, Inc. v. City of Boul-*

*der*, 183 Colo. 117, 122, 515 P.2d 627, 629 (1975); *see also* 2 Anderson, *American Law of Zoning 3d* § 11.14 (1986). PUDs allow municipalities to develop self-contained communities with residential areas conveniently near stores and services. Note, *Exclusionary Use of the Planned Unit Development: Standards for Judicial Scrutiny*, 8 Harv.C.R.–C.L.L.Rev. 384, 391 (1973). The PUD approval process is designed to promote the public interest by allowing municipalities to bargain with developers over the development's characteristics. *Id.* at 393. A planning board can use its power under a PUD ordinance to negotiate a PUD plan that is profitable to the developer and beneficial to the community. *Id.* at 394. Boulder's PUD ordinance is also designed to serve the public interest in these ways. Section 9–4–12(a), Boulder Rev.Code, states that

> [t]he purpose of planned units is to allow flexibility and encourage innovation in land use development, promote the most appropriate use of land, improve the design, character, and quality of new development, facilitate the adequate and economical provision of streets and utilities, and preserve the natural and scenic features of open space.

In my opinion the right which Bixby seeks to enforce in this case is different from typical PUD restrictions on land use designed to serve the public interest. Bixby claims an interest in the shopping center parking lot in the form of an easement or license. Thus Bixby is attempting to secure an interest in land for its benefit. I would hold that Bixby cannot rely on the statement of intent in the PUD plan to acquire an easement to use the shopping center parking lot.

The majority holds that the PUD plan provisions are binding upon members of the public because the PUD plan approval was obtained pursuant to a PUD ordinance adopted as a valid exercise of Boulder's police power through its zoning authority. At 1033. The majority further holds that the public nature of the PUD plan provisions precludes the need for any recordation of the plan provisions in order to

provide notice to subsequent purchasers. *Id.* The majority gives the Board's approval of the PUD the same notice effect that a legislative zoning enactment would have. In my opinion, the approval of a PUD plan by a city planning board involves a fundamentally different process than the legislative enactment of a zoning ordinance. The approval of PUD provisions, which is a quasi-judicial act, cannot provide notice to subsequent purchasers equivalent to the notice provided by a legislative zoning enactment.

There is no litmus-like test for identifying quasi-judicial action. *Cherry Hills Resort v. Cherry Hills Village*, 757 P.2d 622, 627 (Colo.1988). In *Cherry Hills*, 757 P.2d at 625, we stated that, "[q]uasi-judicial action ... generally involves a determination of the rights, duties, or obligations of specific individuals on the basis of the application of presently existing legal standards or policy considerations to past or present facts developed at a hearing conducted for the purpose of resolving the particular interests in question." *See also City and County of Denver v. Eggert*, 647 P.2d 216, 222 (Colo.1982) ("Quasi-judicial action decides rights and liabilities based upon past or present facts."). "Legislative action is usually reflective of some public policy relating to matters of a permanent or general character, is not normally restricted to identifiable persons or groups, and is usually prospective in nature." *Cherry Hills*, 757 P.2d at 625; *Eggert*, 647 P.2d at 222.

We noted in *Cherry Hills*, 757 P.2d at 627, that the central focus of an inquiry to determine whether action is quasi-judicial or legislative "should be on the nature of the governmental decision and the process by which that decision is reached." The existence of a legislative scheme mandating notice and hearing is not the predominant consideration in the present inquiry. *Id.* However, "[t]he existence of a statute or ordinance mandating [notice and hearing] is compelling proof that any decision under the legislative scheme is intended to be quasi-judicial in character." *Id.* at 626.

We have consistently held that when a municipality amends a comprehensive zoning ordinance by approving a planned unit development application, it acts in a quasi-judicial manner. *See* maj. op. at 1032 n. 8; *Sherman v. Colorado Springs Planning Comm'n*, 763 P.2d 292, 296 (Colo.1988) (city council's denial of applicant's development plan was quasi-judicial action); *Cherry Hills*, 757 P.2d at 623 (city council's approval of development plan for residential and resort hotel complex constituted quasi-judicial action); *Snyder v. City of Lakewood*, 189 Colo. 421, 425, 542 P.2d 371, 374 (1975) (by rezoning certain church property pursuant to statutory criteria City of Lakewood acted in quasi-judicial manner); *Dillon Cos., Inc. v. City of Boulder*, 183 Colo. 117, 119, 515 P.2d 627, 628 (1975) (Boulder city council acted as adjudicative body by approving PUD plan application by passing ordinance).

The quasi-judicial proceedings established by the Boulder ordinance do not provide adequate notice to subsequent purchasers of interests in land claimed by private third parties pursuant to PUD plans. The PUD provisions of the Boulder ordinance require the city manager to post notice of a PUD plan application on the property for which the application is filed, Boulder Rev.Code § 9–4–2(d)(1), and send the notice to owners of property located within three-hundred feet of the boundaries of the land included within the application. Boulder Rev.Code § 9–4–2(d)(2). The city manager is directed by Boulder Revised Code section 9–4–3(a) to mail a written recommendation or decision and findings to the applicant, the appropriate approving agency or appeal body, and the owners of property to whom notice was mailed and who have requested notice. The words "to whom notice was mailed" appear to refer to section 9–4–2(d)(2), which directs the city manager to send notice of PUD plan applications to the owners of property located within three-hundred feet of the boundaries of the land included within the application. The section states that "[t]he purpose of [this] mailed notice is reasonably to inform surrounding property owners of an application for development review." Boulder Rev.Code § 9–4–2(d)(2). Thus it is likely that, as happened in this case, subsequent

purchasers of property within a PUD will not have received notice of interests in land conveyed to private parties pursuant to the PUD plan. Under such circumstances it is unjust to hold subsequent purchasers of land within a PUD to the private conveyances effected by PUD plans. The same reasoning supports Professor Davis's suggestion that, in the administrative law area, "when an agency is aware of the significance of its creativity in a particular adjudication and of the important impact on nonparties, it should consider the question whether notice and comment procedure is desirable in the circumstances." 3 K. Davis, *Administrative Law Treatise* § 14.6 (1980).

The majority's holding is also contrary to the purpose of the recording act, which is to provide subsequent purchasers with a reliable means for discovering encumbrances and liens on their property. The PUD plan approval procedures established by Boulder's ordinance do not provide that kind of reliable notice to subsequent purchasers.

The majority contends that, taken to its extreme, South Creek's argument suggests that a city could never enforce provisions of an unrecorded PUD against a subsequent purchaser no matter how essential to public safety and welfare those decisions might be. At 1033 n. 9. Boulder is not enforcing the PUD as a party in interest in this case. In this case Bixby is attempting to establish an interest in land for its own benefit and not in the interest of the public safety and welfare. Therefore this case has no bearing on the ability of municipalities and private parties to enforce unrecorded PUD plans which serve the public interest. Boulder could enforce the unrecorded PUD plan during the development of the plan by withholding building permits or denying a developer's request for a variance. Boulder could enforce the unrecorded PUD plan after completion of the development by withholding variations from the original PUD. Boulder or a private party could enforce the unrecorded PUD plan if the action complained of undermined the public benefit promoted by the Board's approval of the PUD plan. However, a private party should not be able to rely on an unrecorded PUD plan to establish for its benefit an interest in property, because such use of an unrecorded PUD plan does not serve the purpose of a PUD and undermines the objectives of the recording act. I would hold that the facts of this case distinguish it from a municipality's or a private party's attempt to enforce a PUD plan provision which furthers the public interest.

## III.

The statements of intent in the PUD plan provisions were insufficient to convey an interest in the parking lot to the private school because the PUD plan provisions were not recorded, and the language of the statements of intent was insufficient to convey an interest in property.

Bixby is precluded by Colorado's recording statute from enforcing any interest it may have in the parking lot. Section 38–35–108, 16A C.R.S. (1982), provides that

> [w]hen a deed or any other instrument in writing affecting title to real property has been recorded and such deed or other instrument contains a recitation of or reference to some other instrument purporting to affect title to said real property, such recitation or reference shall bind only the parties to the instrument and shall not be notice to any other person whatsoever unless the instrument mentioned or referred to in the recital is of record in the county where the real property is situated. Unless the same is so recorded, no person other than the parties to the instrument shall be required to make any inquiry or investigation concerning such recitation or reference.

The warranty deed which conveyed the shopping center property to South Creek contained an exception for matters set forth in an exhibit entitled Exhibit A, which was attached to the deed. Exhibit A referred to the subdivision agreement, which in turn referred to the PUD plan. According to section 38–35–108 the PUD plan did not affect title to the shopping center property, and was not notice to South Creek

that Bixby possessed an easement to park on the property. Section 38–35–109, 16A C.R.S. (1982), in effect at all relevant times, provided that no document conveying, encumbering or affecting the title to real property "shall be valid as against any class of persons with any kind of rights, except between the parties thereto and such as have notice thereof, until the same is deposited with [the] county clerk and recorder." These statutes ensure that those who perform title searches can rely on the documents located at the county clerk and recorder's office to discover every enforceable conveyance of the property in question and all enforceable encumbrances on that property. *Page v. Fees–Krey, Inc.*, 617 P.2d 1188, 1192–93 (Colo. 1980); *McMurtrie v. Riddell*, 9 Colo. 497, 500–501, 13 P. 181, 183 (1886). The majority opinion will force subsequent purchasers to engage in exhaustive searches to discover interests in their land transmitted to third parties as a result of the approval of PUD plan applications by city planning boards. In the present case Judge Van Cise described the PUD plan application as a "voluminous mass of documents." *South Creek Assocs. v. Bixby & Assocs.*, 753 P.2d 785, 790 (Colo.App.1987) (Van Cise, J., dissenting). Because South Creek had no notice of Bixby's claimed interest in the shopping center property, and the documents purporting to create that interest were not recorded, Bixby should be prevented from enforcing its claimed right to use the parking lot.

In addition to the recording problem, the statement of intent in the PUD plan was insufficient to convey an easement over the South Creek parking lot to Bixby's predecessor. "A plaintiff in a quiet title action ... bears the burden of establishing title in the property superior to that of the defendant." *Hutson v. Agricultural Ditch & Reservoir Co.*, 723 P.2d 736, 738 (Colo. 1986). An easement is an interest in land. *Wright v. Horse Creek Ranches*, 697 P.2d 384, 387 (Colo.1985); *DeReus v. Peck*, 114 Colo. 107, 111, 162 P.2d 404, 406 (1945). Documents purporting to transfer an interest in real property require the formality of operative words of present conveyance which accurately identify the property conveyed. *Hutson*, 723 P.2d at 739; *Harrison v. Everett*, 135 Colo. 55, 60, 308 P.2d 216, 219 (1957); *Lambert v. Murray*, 52 Colo. 156, 166, 120 P. 415, 419 (1912). The language in the statement of intent in the PUD plan was insufficient to convey any interest in the South Creek property to the private school. The PUD plan merely stated that "the adjacent parking lot will be available for the mutual use of the school and the commercial facility," and that "[t]he parking on the southeast portion of the site is intended for the mutual use of the school and the shopping center tenants." As Judge Van Cise correctly noted in his dissent, these statements "reveal[ ] no present intent to convey. Neither the dominant nor servient tenement is described. And, the time during which the grant continues is not set forth." *South Creek Assocs.*, 753 P.2d at 789 (Van Cise, J., dissenting). The statements expressed McStain's intended use of the property, but were not sufficient to convey to the owners of the private school an easement to use the shopping center parking lot. *Cf. Lambert*, 52 Colo. at 166, 120 P. at 419. The PUD plan granted at most a revocable license to the private school to use the parking lot. *See Lehman v. Williamson*, 35 Colo.App. 372, 375–76, 533 P.2d 63, 65 (1975).

The PUD plan provisions did not secure an easement for Bixby because they did not provide sufficient notice to South Creek of Bixby's claimed interest in the land. Neither the PUD plan application nor the warranty were sufficient to convey an interest in the property to Bixby's predecessor. Bixby cannot enforce a nonexistent easement.

I respectfully dissent.