**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 7 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

HIGH COUNTRY CITIZENS'
ALLIANCE,

       Plaintiff-Appellant,

v.

UNITED STATES FOREST SERVICE,

       Defendant-Appellee

Case No. 97-1373

(D. C.  No. 96-WY-2009-CB)
(District of Colorado)

---

**ORDER AND JUDGMENT**[*]

---

Before **TACHA, McWILLIAMS, and HENRY**, Circuit Judges.

---

    High Country Citizens' Alliance (HCCA), an environmental organization located

in Crested Butte, Colorado, appeals the district court's order affirming a decision of the

United States Forest Service.  In particular, HCCA challenges the issuance of a special

permit to Craig and Judy Pauly, who own property surrounded by the Gunnison National

Forest.  The permit allows the Paulys to snowplow approximately two miles of a Forest

---

    [*]   This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel.  The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

Service road so that they can reach their residence by automobile in winter. We conclude that the granting of the special use permit was neither arbitrary nor capricious nor contrary to applicable law. We therefore affirm the district court's decision.

## I. BACKGROUND

In June 1994, the Paulys purchased a 113-acre parcel of land in Gunnison County, Colorado surrounded by the Gunnison National Forest. Located seven miles from the nearest paved road, the Paulys' property contains a single family residence and can be reached from the Cement Creek Road, a graveled forest development road located on Forest Service property.

When the Paulys purchased the property, Gunnison County provided snowplowing services for only the first five miles of the Cement Creek Road, from Highway 135 to the Cement Creek Ranch, another private inholding. Neither Gunnison County nor the Forest Service snowplowed the two mile section from the Cement Creek Ranch to the Paulys' property, and the unplowed section of the road was used for cross-country skiing and snowmobiling. Thus, during periods of heavy snowfall, the Paulys could not reach their property by automobile.

In July 1994, the Paulys applied for a special use permit allowing them (at their own expense) to snowplow the two mile section of the Cement Creek Road from the Cement Creek Ranch to their property. The Forest Service solicited public comments

2

about the Paulys' application and received over 100 responses.

Many local residents opposed the application, raising recreational, safety, and environmental concerns. In particular, they contended that the issuance of the permit would deprive the public of the opportunity to ski and snowmobile on the section of the Cement Creek Road leading to the Paulys' inholding. Other citizens argued that the issuance of the permit would establish a precedent of allowing snowplowing in remote locations, thereby interfering with their enjoyment of other areas of the Forest. Still others maintained that the snowplowing would increase the risk of avalanches and collisions involving automobiles, snowmobiles, and skiers, and would damage the trees surrounding the road.

HCCA expressed many of these concerns in a letter received by the Forest Service on September 12, 1994:

> Snowplowing and upgrading of rough roads has negative impacts to local economies, traditional lifestyles, public safety, environment, and development patterns. Weighing against these critical public concerns is only one value, the desire of private individuals to subdivide and live deeper in the backcountry. It is not the responsibility of the government to maximize profit opportunities for individuals. Your job is to protect the public interest. Sometimes the public interest coincides with private interests. But on this matter, the public interest . . . completely conflicts with private.

Aplt's App. at 862.

The Board of County Commissioners of Gunnison County also opposed the Paulys' permit application. The Commissioners asserted that the requested snowplowing

3

was inconsistent with a resolution that the Board had passed in December 1996. That resolution, number 86-42, approved the construction of a single family residence that was "not intended for year-round occupation." See id. at 791. By seeking to snowplow Cement Creek Road so that they could drive to their property, the County argued, the Paulys were attempting to use their property "year-round" in violation of the resolution.

The Forest Service also received several letters in support of the Paulys' application. See, e.g., id. at 883-85. One citizen, who owned property adjoining the Paulys' inholding, stated that the denial of the permit "would impose severe and unnecessary hardships" upon them. See id. at 883. Additionally, a lawyer retained by the Paulys sent two letters to the Forest Service. See id. at 533-43. Invoking a federal statute providing owners of property within the boundaries of a National Forest with access adequate for "reasonable use and enjoyment," see id. at 533 (quoting 16 U.S.C. § 3210), the Paulys' lawyer contended that the permit should be granted.

On September 26, 1994, District Ranger James R. Dawson sent a letter to the Paulys informing them that he had denied their application for a special use permit because the permit was "not in the public interest." Id. at 532. Ranger Dawson explained that similar properties in the area had "not necessarily included winter access by other than over-the-snow types of transportation." Id. He also noted the Board of County Commissioner's position that snowplowing was inconsistent with Resolution 86-42.

The Paulys then pursued an administrative appeal of Ranger Dawson's decision.

4

See id. at 515-43. They argued that snowplowing of the two mile section of Cement Creek Road was necessary in order to provide them with reasonable access to their property. They also argued that Ranger Dawson's denial of the permit violated their Fifth Amendment rights by taking their property without just compensation and depriving them of equal protection of the law. See id. at 522-23.

On December 21, 1994, Forest Supervisor Robert L. Storch responded to the Paulys' appeal by ordering reconsideration of the decision to deny the snowplowing permit. See id. at 509-510. Mr. Storch explained that in his view reasonable access to the Paulys' inholding included access by automobile in the winter. He noted the opposition to the permit application from the public and from Gunnison County officials but said that the Paulys' right of access outweighed those considerations.

On September 27, 1995, Mr. Storch issued a decisional memorandum granting the Paulys a one year permit to snowplow the two mile section of the Cement Creek Road. Mr. Storch's memorandum again explained that, in spite of local opposition, granting the permit was necessary to insure the Paulys' reasonable access to their property in the wintertime. See id. at 545-47. He added that he had considered the environmental impact of allowing snowplowing on the road and had concluded that the resources of the National Forest would not be adversely affected. See id. at 546.

Subsequently, the Paulys sought renewal of the special use permit for the winter of 1996-97. The Forest Service again afforded the public an opportunity to comment on the

Paulys' application. It received twenty letters in opposition to the Paulys' application and sixteen supporting it. See id. at 175. Many of the letters opposing the application raised the same recreational, environmental, and safety concerns that had been advanced in opposition to the Paulys' initial application.

On February 14, 1997, Mr. Storch issued a decisional memorandum granting the special use permit for a five year period. See id. at 166-74. Mr. Storch began by explaining the history of the dispute over the Pauly's request to snowplow Cement Creek Road. He noted the considerable opposition to the request, from both the public and from Gunnison County officials. See id. at 166 (observing "[m]ost of the public input can be characterized as solidly against allowing snow plowing and, in effect, opening up Cement Creek Valley in the winter," and "Gunnison County came out strongly against the request to plow snow above Cement Creek Ranch"). Mr. Storch then explained why he believed that the county land use restrictions did not preclude the granting of the Paulys' application. He reported that he "took into account the 1986 resolution of the Board of County Commissioners which restricted the former owners of the Pauly property from year-round occupancy. That resolution was evidently not of public record at the time the Paulys purchased the property and the resolution did not specifically eliminate winter-time use of the residence." Id. at 167.

The memorandum then explained Mr. Storch's view of the applicable law. It rejected the Paulys' contention that the Forest Service lacked discretion and was required

6

to grant the permit application.  Instead, while "[i]nholders do have a statutory right of access under ANILCA [the Alaska National Interest Lands Conservation Act of 1980, 16 U.S.C. § 3210], . . . that right is clearly subject to reasonable regulation."  Id. at 169.  Mr. Storch therefore considered the adverse effects of allowing access to inholdings and the possibility of mitigating those effects.  See id.

The memorandum considered the safety risks and environmental concerns associated with snowplowing.  As to safety concerns, it noted that even after the granting of the permit, the general public would still be prohibited from using wheeled vehicles on the section of the road in question.  It reasoned that this prohibition would lessen the risk of people being stranded by heavy snowfall and of vehicles colliding.  See id. at 172.

As to environmental effects, the memorandum concluded that snowplowing "will be of limited context and intensity and will result in little or no environmental effects to either the physical or biological components of the environment."  Id. at 173.  Because of this minimal effect on the environment, the snowplowing permit fell within a categorical exclusion from the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321-4370.  Mr. Storch also concluded that the following required mitigating measures would limit the adverse effects:  (1) plowing would not be allowed after approximately April 1 of each year, to prevent damage to the road from wheeled vehicles as the snow thawed; (2) the permit required the plowing to be directed away from a certain area ("the Ptarmigan habitat"); (3) the permit required at least a four inch layer of

snow to be left on the road after plowing to facilitate travel by cross country skiers and snowmobiles; and (4) the permit required the full width of the road to be plowed, in order to facilitate passing of vehicles and skiers. See Aplt's App. at 173. Mr. Storch's memorandum added that Forest Service personnel had visited the Cement Creek plowing location four times since the temporary permit was issued and "no measurable impacts to the environment or health and safety have been identified as a result of plowing the road." Id. at 168.

The memorandum also considered ten other roads in the Gunnison National Forest on which snowplowing had been authorized by the Forest Service. Nine of these snowplowed roads served residences in winter and one of them was used for hauling timber. See id. at 170-71. It concluded that the impact of snowplowing the section of the Cement Creek Road at issue would resemble the impact of snowplowing these other roads. The memorandum did acknowledge that there were a number of roads in the Gunnison National Forest that were not snowplowed but that provided access to winter residences by "over-snow methods." Id. at 171. It explained that roads were not considered in conducting the analysis because the Forest Service had received no requests to plow them. Mr. Storch also noted that "when we discussed snowplowing with other National Forests and Regions, we found they allow the plowing of snow in many places for many reasons. The consensus was that plowing is routinely allowed." Id. at 172.

The memorandum summarized the reasons for granting the snowplowing permit as

follows:

> (1) the lack of environmental or safety risks; (2) the fact the private land needing access has a residence used during the winter season; (3) the fact that the road being plowed is an existing Forest Development Road; (4) the fact that the permit merely extends an existing use since the County has plowed the lower 5-mile section of the Cement Creek Road from Colorado Highway 135 for the last 11 years; and (5) a determination that the Cement Creek Ranch and nine others were similarly situated properties. The nine similarly situated properties were persuasive in my analysis but the adjacent plowing of the same road to Cement Creek Ranch was compelling. It only seemed reasonable to allow the short extension of plowing to the adjacent Pauly inholding.

Id.

## II. DISCUSSION

On appeal, HCCA advances four challenges to the Forest Service's issuance of the special use permit allowing snowplowing on the Cement Creek Road. It contends that: (1) the Forest Service erred in failing to consider the Gunnison County land use restriction providing that the Paulys' residence was "not intended for year-round occupation," id. at 791; (2) the Forest Service acted arbitrarily in analyzing the access afforded to other properties by only considering instances in which snowplowing had been requested; (3) the Forest Service failed to adequately consider the public interest in leaving the road unplowed; and (4) the Forest Service erred in concluding that the snowplowing permit was categorically excluded from an environmental analysis under NEPA.

9

In reviewing the Forest Service decision to grant the special use permit, we apply the same standard as the district court. See Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1580 (10th Cir. 1994). We consider whether the Forest Service acted arbitrarily, capriciously, or contrary to law. See id. at 1573-74; see also Sabin v. Butz, 515 F.2d 1061, 1065 (10th Cir. 1975) (applying arbitrary and capricious standard of review to Forest Service's issuance of a special use permit). We must "ascertain whether the agency examined all the relevant data and articulated a rational connection between the facts found and the decision made." Olenhouse, 42 F.3d at 1574 (footnote omitted) (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co., 463 U.S. 29, 43 (1983)).

In order to affirm the the Forest Service's decision, we must be assured that it considered the relevant factors and made no clear errors in judgment. Id. at 1574. On the other hand, the Forest Service's decision should be set aside if it

> relied on factors which Congress has not intended for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

See id. (quoting Motor Vehicle Mfrs. Ass'n , 463 U.S. at 43). If the Forest Service, "failed to provide a reasoned explanation for its action, or if limitations in the administrative record make it impossible to conclude that the action was the product of reasoned decisionmaking, the reviewing court may supplement the record or remand the case to the agency for further proceedings." Id. at 1575.

10

Mindful of these principles, we being our analysis with a review of the applicable statutes and regulations governing the issuance of special use permits to provide access to inholdings in the national forests. Then, we consider each of HCCA's challenges to the granting of the permit.

## A. Adequate Access to Inholdings

Access to private inholdings within Forest Service lands is governed by the Federal Land Policy Management Act (FLPMA), 43 U.S.C. §§ 1701-1782, the Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3101-3233 (ANILCA), and accompanying regulations. See generally United States v. Jenks, 22 F.3d 1513, 1514-16 (10th Cir. 1994) (discussing the enactment of the FLPMA and the ANILCA). Title V of the FLPMA vests the Secretaries of Agriculture and the Interior with the authority to "grant, issue, or renew rights-of-way over . . . [Forest Service and public lands] for . . . roads, trails [and] highways." 43 U.S.C. § 1761(a). Section 3210(a) of the ANILCA specifically addresses the right of access to privately owned inholdings within Forest Service lands:

> Notwithstanding any other provision of law, and subject to such terms and conditions as the Secretary of Agriculture may prescribe, the Secretary shall provide such access to nonfederally owned land within the boundaries of the National Forest System as the Secretary deems adequate to secure to the owner the reasonable use and enjoyment thereof: Provided, That such owner comply with rules and regulations applicable to ingress and egress to or from the National Forest System.

11

16 U.S.C. § 3210(a). The ANILCA thus grants inholders "a threshold 'right of access to their lands subject to reasonable regulation.'" Jenks, 22 F.3d at 1516 (quoting Adams v. United States, 3 F.3d 1254, 1258-59 (9th Cir. 1993)).

Accompanying regulations establish a permit system under which owners of inholdings must request permission for particular uses of Forest Service lands. See Jenks, 22 F.3d at 1517-18 (discussing permit system). Pursuant to the ANILCA regulations, the Forest Service must provide property owners with access that is adequate to secure reasonable use and enjoyment of their property. See 36 C.F.R. § 251.110(c). "Adequate access" to an inholding is defined as "a route and method of access to non-Federal land that provides for reasonable use and enjoyment of the non-Federal land consistent with similarly situated non-Federal land and that minimizes damage or disturbance to National Forest System lands and resources." 36 C.F.R. § 251.111. The regulations further provide that in determining what constitutes adequate access, the Forest Service should consider the uses of other property in the relevant area:

> In issuing a special-use authorization for access to non-Federal lands, the authorized officer shall authorize only those access facilities or modes of access that are needed for the reasonable use and enjoyment of the land and that minimize the impacts on the Federal resources. The authorizing officer shall determine what constitutes reasonable use and enjoyment of the lands based on contemporaneous uses made of similarly situated lands in the area and any other relevant criteria.

36 C.F.R. § 251.114(a). A regulation enacted pursuant to the FMLPA and in effect at the

time of the Paulys' application provided that a permit for the use of Forest Service lands may be denied if "[t]he use would otherwise be inconsistent with applicable Federal and State laws." 36 C.F.R. § 251.54*(i)*(4) (1996).

Accordingly, in deciding whether to issue a special use permit to the owner of an inholding pursuant to the FMLPA, the ANILCA, and accompanying regulations, the Forest Service must determine: (1) what uses of the property are reasonable; and (2) what access is adequate to allow for those reasonable uses. We must affirm the Forest Service's decision to issue the permit unless those determinations are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See Olenhouse, 42 F.3d at 1574 (quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 413-14 (1971)).

### B. Gunnison County Land Use Restriction

"The crux of [HCCA's] appeal," Aplt's Reply Br. at 1, is that the Forest Service acted arbitrarily and capriciously by finding County Resolution 86-42 irrelevant to the decision of whether to issue the special use permit to the Paulys. As noted above, Resolution 86-42, adopted by the Board of County Commissioners of Gunnison County on December 16, 1986, granted a land use change to the previous owners of the inholding. The resolution authorized the construction of a single family residence in the following terms: "Land Use Change Application No. 1986-27 is hereby approved as a

13

development of Minor Impact, not intended for year-round occupation." Aplt's App. at 791. It further provided, "T[his] R[esolution] and the approval granted hereby shall not be effective unless and until a copy is recorded in the Office of the Clerk and Recorder of Gunnison County at the expense of the applicant." Id. In his decisional memorandum, Mr. Storch reported that he took Resolution 86-42 into account. However, he made two observations: the "resolution was evidently not of public record at the time the Paulys purchased the property and the resolution did not specifically eliminate winter-time use of the residence." Id. at 167.

HCCA challenges both observations. As to Mr. Storch's comment that the resolution did not eliminate wintertime use, it contends that the phrase employed in the resolution—"year-round"—is synonymous in Gunnson County with "used in wintertime." See Aplt's Br. at 15. Thus, "[w]here winter dominates life for six months of the year, 'year round' is a common colloquialism—a road that is 'open year-round' is open in winter; a house that has 'year round access' is one you can drive to in winter." Id. It points out that the Forest Service has often used the phrase "year-round" in the same way. See id. at 16. Thus, HCCA maintains, when the County resolution provided that the residence on the Paulys' inholding was "not intended for year-round occupation," it meant that the house was not intended to be a wintertime residence.

As to Mr. Storch's other observation—that the "resolution was evidently not of public record at the time the Paulys purchased the property"—HCCA invokes Colorado

14

property law. It notes that "a property owner is subject to conditions or restrictions imposed by a local development approval regardless of whether or not it was recorded." Aplt's Br. at 14 (citing Southcree Assocs. v. Bixby & Assocs., 781 P.2d 1027 (Colo. 1989)). It adds that the resolution was in fact recorded by the time that the initial snowplowing permit was issued in 1994. See Aplt's Reply Br. at 6. It therefore concludes that the Forest Service's approval of the special use permit was based on a misunderstanding of the applicable law.

Although HCCA makes a strong linguistic point about the connotations of the phrase "year-round" in Gunnison County, it has not established that Mr. Storch acted arbitrarily or capriciously in considering Resolution 86-42. Significantly, many of HCCA's examples of the use of the phrase "year-round" do not involve the situation that confronts us here—the interpretation of an enactment of a governmental body that purports to restrict citizens' use of property. Moreover, the wording of the resolution still leaves many issues unresolved. For example, even if "year-round" generally means "wintertime," it is not clear from the resolution how much wintertime use is prohibited. Thus, if the owners of the inholding use the residence for one day in the winter, or one week, or two months out of three, the resolution does not specify which of these uses, if any, would be prohibited.

Notably, HCCA itself has suggested that the resolution is somewhat unclear. In a July 20, 1995 letter to the Regional Forester, HCCA's President acknowledged:

15

[t]he restriction put on the Pauly (at that time Kolosta) house was vague. It was a tentative step in a time when the County was just beginning to emerge from the laissez-faire approach to land use. Today, new homes proposed for construction in Cement Creek and elsewhere receive much more thorough scrutiny and restrictions.

What's done is done and we will have to live with the County's earlier action. I believe it will be a tough case should the County seek to enforce its "less than year-round occupancy" restriction on the Pauly's.

Aplt's App. at 361-62.

The ambiguity of the resolution is further confirmed by evidence cited by the district court. In particular, David Leinsdorf, one of the members of the Gunnison County Board of Commissioners who voted to approve Resolution 86-42, responded to an inquiry from the Paulys' attorney by explaining that the resolution was not intended to prohibit wintertime use of the residence on the inholding:

Although I had no specific recollection of this approval prior to reviewing the Minutes and Resolution, I do know that, as County Commissioner, I was always concerned that, when people proposed construction in areas not served by a plowed public road, they should not expect County plowing.

Therefore, I often had the record establish that the County would not provide winter maintenance, as I did during the meeting on December 9, 1986. The language "not intended for year round occupation" in Resolution 42, Series 1986 was to reflect the fact that the County, in approving the Land Use Change, assumed no winter maintenance responsibility. I certainly had no intention to prevent the owners from using the house in winter as long as they did not expect the County to plow.

Id. at 758.

16

Minutes from the meetings in December 1986 confirm Mr. Leinsdorf's recollection that the Board of County Commissioners was concerned about the costs of winter road maintenance when it approved Resolution 86-42. When the resolution was first proposed, Mr. Leinsdorf asked whether the owners of the inholding (the Kolostas) understood "that the County has no foreseeable plans to provide winter maintenance." Aplt's App. at 755 (minutes of Dec. 9, 1986 meeting). Another member of the board, Rikki Santorelli, said, "It's up to them if they want to get there <u>let 'em plow</u> or take a snowmobile." <u>Id.</u> (emphasis added). At the following meeting (when the resolution was approved), another commissioner explained that Mr. Leinsdorf had been "concerned that we make some sort of notation that this approval was not for year-round—it was not intended for year-round occupation of the residents i.e. so we wouldn't be in a road maintenance situation." <u>Id.</u> at 757 (minutes of Dec. 16, 1986 meeting).

In its appellate brief, HCCA criticizes the district court's reliance on the comments of Mr. Leinsdorf. It observes that these comments were not cited in Mr. Storch's decisional memorandum. Moreover, according to HCCA, Mr. Leinsdorf's comments are inconsistent with the Forest Service's position in this case. HCCA observes that while Mr. Leinsdorf appears to believe that Resolution 96-42 imposed no restrictions whatsoever on the use of the inholding (as long as the residents themselves paid for maintenance costs like snowplowing in winter), the Forest Service has repeatedly acknowledged that the resolution does impose restrictions on use. <u>See</u> Aplt's Reply Br. at

17

7-9. Because "an agency's action must be upheld, if at all, on the basis articulated by the agency itself," Aplt's Reply Br. at 2 (quoting Motor Vehicles Ass'n, 463 U.S. at 43), HCCA maintains that the Forest Service may not now rely on Mr. Leinsdorf's interpretation of the ordinance.

We are not convinced by HCCA's challenge to this evidence. It is true that Mr. Storch's decisional memorandum discusses neither Mr. Leinsdorf's interpretation nor the Board of County Commissioner's proceedings. However, that evidence illustrates a larger point that the memorandum does address: that the resolution may be reasonably read to allow some use of the property in the wintertime. As the Forest Service observes in its appellate brief, Mr. Storch was not required to cite every item of evidence supporting his view. See Bagdonas v. Department of Treasury, 93 F.3d 422, 426 (7th Cir. 1996) (noting that "[t]he statement of reasons need not include detailed findings of fact but must inform the court and the petitioner of the grounds of decision and the essential facts upon which the administrative decision was based'") (quoting Kitchens v. Department of the Treasury, 535 F.2d 1197, 1200 (9th Cir.1976)). Accordingly, like the district court, we conclude that the evidence surrounding the enactment of Resolution 86-42, including the comments of Mr. Leinsdorf, may be considered in assessing the Forest Service's decision to issue the special use permit.

Mr. Leinsdorf's interpretation, HCCA's acknowledgment that the resolution was "vague," and the wording of the resolution itself, provide support for the Forest Service's

18

view that, in spite of the resolution, it was still reasonable for the Paulys to use the residence during winter. We therefore conclude that the Forest Service did not act arbitrarily or capriciously in analyzing the resolution's effect.[1]

### C. Consideration of Similarly Situated Lands

Next, HCCA argues that the Forest Service erred in failing to consider "contemporaneous uses made of similarly situated lands in the area." 36 C.F.R. § 251.114(a). In particular, HCCA criticizes the Forest Service's failure to consider lands in which access was allowed by over the snow methods. It also notes that several of the specific properties that the Forest Service did consider (i.e., properties on which access by snowplowing was allowed) are not comparable to the Paulys' inholding. For example, HCCA observes, snowplowing of the road to one of these properties was only allowed until Thanksgiving. In other instances, snowplowing of Forest Service roads also allowed access to winter recreation trailheads. See Aplt's Reply Br. at 11-12.

We are not persuaded. The regulation on which HCCA relies does not define what constitutes "similarly situated" property, and it thus vests the Forest Service with

---

[1] In light of that conclusion, we need not address the significance of the timing of the recording of the resolution. We note in passing that Mr. Storch himself reached no ultimate conclusions about the need for recording of the resolution. He merely observed what both parties here concede: that the resolution was not recorded when the Paulys purchased the inholding.

considerable discretion in determining the particular properties that should be taken into account in deciding whether to issue special use permits. Moreover, Mr. Storch's decisional memorandum provided an explanation for not considering properties for which snowplowing had not been requested: there are over 100,000 acres of private land within the Gunnison National Forest, decisions whether to allow snowplowing on Forest Service Roads are made on a case by case basis, and, "[a]bsent an application to plow snow, it is not reasonable to examine each such inholding on the Forest in detail." Aplt's App. at 171.

Accordingly, we conclude that the Forest Service did not act arbitrarily, capriciously, or contrary to the law in considering "similarly situated" properties in assessing the Paulys' application for a special use permit.

### D. Consideration of the Public Interest

HCCA also argues that the Forest Service erred in failing to consider the public interest, thereby violating a regulation that required it to do so. See 36 C.F.R. § 251.54(i)(2) (1996). That argument is not supported by the record.

The record does indicate that citizens submitted comments regarding the adverse impact of snowplowing on various winter activities and the environment. However, the Forest Service did consider those comments. As Mr. Storch explained, he believed these adverse effects could be controlled by mitigating measures. See id. at 173. Also,

"plowing was tested twice. No adverse effects were identified which would preclude plowing." Id at 169.

We acknowledge that reasonable citizens could readily conclude that, given its effects on winter recreational activities and the wilderness environment, snowplowing of Cement Creek Road to the Paulys' property was unwarranted. However, given the Paulys' right of reasonable access to their residence, the treatment of similarly situated properties, and efforts to mitigate potentially adverse effects, the Forest Service did not act arbitrarily or capriciously or contrary to law when it disagreed with those citizens in assessing the public interest involved in the Paulys' request.

## E. NEPA Requirements

Finally, HCCA argues that the Forest Service erred in failing to require the preparation of an environmental assessment under NEPA prior to granting the special use permit. According to HCCA, because there are steep slopes near the Cement Creek Road, snowplowing increases the risk of an avalanche. Therefore, an environmental assessment was required, and the failure to prepare one should invalidate the special use permit.

As the Forest Service notes, NEPA regulations provide that an agency may exclude from the ordinary requirement of preparing an environmental assessment or an environmental impact statement those "actions which do not individually or cumulatively

21

have a significant effect on the human environment and which have been found to have no such effect." 40 C.F.R. § 1508.4. However, any such agency exclusion "shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." Id.

Here, in his decisional memorandum Mr. Storch invoked an exclusion set forth in section 31.1b (4) of the Forest Service Handbook 1909.15 (which concerns environmental policies and procedures). See Aplt's App. at 173. That section excludes from the NEPA requirements the "[r]epair and maintenance of roads, trails, and landline boundaries." Id. (quoting Forest Service Handbook 1909.15—Environmental Policy and Procedures Handbook § 31.1b(4)).

One extraordinary circumstance overriding the NEPA exclusion is the "presence of steep slopes." See Forest Service Handbook 1909.15 § 30.3.2. In challenging the Forest Service's application of the exclusion, HCCA cites evidence from the record indicating that Cement Creek Road passes through an avalanche zone. HCCA argues that in light of this evidence, there are extraordinary circumstances requiring the preparation of an environmental assessment under NEPA.

The Forest Service's finding of no extraordinary circumstances is neither arbitrary nor capricious nor contrary to law. In responding to a letter stating that an environmental assessment might be required, the Forest Service noted that "[t]he only thing being impacted is the surface of a two mile section of existing road. The rest of the valley

22

remains in its natural condition." Id. at 182.

More importantly, at Mr. Storch's request, a forestry technician visited the Cement Creek Road corridor in July 1995. See id. at 265-66. The technician acknowledged that "there is terrain adjacent to the road that could pose a potential hazard to travelers from snow avalanches." Id. at 265. However, the technician explained that the snowplowing of the section of the road leading to the Paulys' inholding entailed no additional risk. See id. ("I see no increase in hazard to the general public due to the proposed plowing due to the fact that their exposure to the hazard is unchanged from the past."). Additionally, "[t]he exposure to the hazard for the land owner and the individuals accomplishing the plowing could be lessened considerably by avoiding traversing the area during periods of high or extreme hazard." Id. Finally, evidence in the record indicates that even though there were steep slopes near Cement Creek Road, the road itself is relatively flat. See Aple's Br. at 30-31 (citing Aplt's App. at 680 (topographic map)).

Accordingly, the Forest Service did not commit reversible error in applying the NEPA exception to conclude that an environmental assessment was not required.

III. CONCLUSION

For the reasons set forth above, we conclude that the Forest Service did not act arbitrarily, capriciously or contrary to law in issuing the five-year special use permit to the

Paulys.  We therefore AFFIRM the district court's decision.

Entered for the Court,

Robert H. Henry
United States Circuit Judge