**METROPOLITAN DEVELOPMENT COMMISSION OF MARION COUNTY, et al., Appellants–Defendants,**

**v.**

**PINNACLE MEDIA, LLC, Appellee–Plaintiff.**

**No. 49A05–0309–CV–465.**

Court of Appeals of Indiana.

June 30, 2004.

Jeffrey S. McQuary, Office of Corporation Counsel, Indianapolis, IN, Attorney for Appellants.

Alan S. Townsend, George T. Patton, Jr., Paul D. Vink, Bose McKinney & Evans, LLP, Indianapolis, IN, Attorneys for Appellee.

**OPINION**

FRIEDLANDER, Judge.

The Metropolitan Development Commission of Marion County (the Commission)[1] and the Department of Metropolitan Development of the City of Indianapolis (the DMD)[2] (referred to collectively as "the City") appeal the grant of summary judgment and the award of attorney fees in favor of Pinnacle Media, LLC (Pinnacle) on Pinnacle's complaint for declaratory judgment. The City presents the following restated and consolidated issues for review:

1. Did the trial court properly grant summary judgment in favor of Pinnacle?

2. Did the trial court abuse its discretion in awarding attorney fees to Pinnacle pursuant to Ind.Code Ann. § 34–52–1–1 (West 1999)?

We affirm in part and reverse in part.[3]

The parties do not dispute the material facts. Pinnacle's primary business is the erection of outdoor advertising signs (sign(s)). In a typical transaction, Pinnacle leases land from a landowner, obtains the necessary permits from state and/or local authorities, erects a sign, and then leases space on the sign to various entities. Embarking on such a transaction, Pinnacle entered into leases with the Hoosier Heritage Port Authority (HHPA), which authorized Pinnacle to build two signs on HHPA property that consisted of a railroad corridor located near I–465. Pinnacle then sought to obtain any necessary permits.

In July 1999, Pinnacle contacted the DMD to request permits to build two signs on the HHPA property. After careful consideration of the issue by several DMD officials, the agency responded to Pinnacle's request with a letter dated July 26, 1999.[4] The letter provided in relevant part:

---

1. The Commission is an administrative body vested with the authority to regulate planning and zoning activities within Marion County. It has the power, among other things, to recommend ordinances to the City–County Council for the zoning and regulation of land within Marion County.

2. The DMD is a municipal agency that serves as the administrative staff for the Commission. One of the DMD's tasks is to receive and review permit applications.

3. Oral argument was held in this case on May 12, 2004, in Indianapolis.

4. While Stephen Spencer, a mid-level employee of the DMD, wrote the letter, the record reveals that an attorney for the City reviewed and edited the letter. Further, at least two high-level officials, including the Director of the DMD, thoroughly discussed "[t]he theory behind" the letter before it was sent out. *Appellee's Appendix* at 189. The consensus was that the agency did not have jurisdiction to issue a permit because the property was unzoned.

Based on the location of the proposed sign, to be located on the parcel described in the attached legal description, being located within right-of-way owned and controlled by the State of Indiana, and the fact that the I–465 right-of-way is not within a zoning district, this office lacks jurisdiction to issue, or to require an improvement location permit.

*Appellant's Appendix* at 31. The DMD further recommended that Pinnacle contact the State regarding these issues. Upon receiving this letter, Pinnacle requested clarification from the DMD in light of the fact that the property was owned by HHPA, not the State.[5] The next day, on July 27, the DMD reiterated that the City lacked jurisdiction over Pinnacle's proposed signs because they were to be located on unzoned property:

This letter clarifies my letter to you dated July 26, 1999. [Pinnacle] has restated that the property, upon which the sign is proposed to be located is owned by [HHPA], an entity established pursuant to IC 8–10–5. *Regardless of the ownership of the property, due to the fact that the I–465 right-of-way is not designated as within a zoning district on the zoning maps, this office lacks jurisdiction to issue, or to require an improvement location permit.*

Any approvals required by the State of Indiana, however, must be obtained.

*Appellant's Appendix* at 32 (emphasis supplied). At the time of the letters, the only unzoned areas in Marion County were the interstate rights-of-way.

After receiving the July 1999 letters, Pinnacle requested and obtained permits from the Indiana Department of Transportation (INDOT) and then built the two signs in accordance with its leases with HHPA. The City did not object to the construction of these signs. Soon after the signs were erected, however, the DMD began receiving complaints from neighborhood organizations that were upset about the signs and worried about proliferation of more signs on the unzoned rights-of-way within the I–465 loop.

After building the signs on the HHPA property, Pinnacle pursued more leases on similarly situated unzoned property within Marion County. Pursuant to these leases, the property owners authorized Pinnacle to construct signs at fifteen separate locations. Between February 29 and April 19, 2000, Pinnacle submitted fifteen applications for sign permits to INDOT, one for each of the fifteen leased locations.[6] Pinnacle did not apply for permits from the DMD, as the land remained unzoned.

While Pinnacle was applying for additional permits from INDOT, City officials began, in March 2000, discussing proposals to zone the land under the interstates. Maury Plambeck, then the DMD's Administrator of Current Planning and now the Director of the DMD, drafted a proposed ordinance to zone the interstate rights-of-way. On March 21, 2000, along with a draft of the proposed ordinance, Plambeck circulated an internal memorandum to five individuals that provided in part:

Yesterday, we discussed the problem of advertising signs located within the interstate right-of-way, on railroad right-

---

5. The land underneath and immediately adjacent interstate freeways is owned by the State. Apparently, the only exceptions to this are tiny slivers of land where the freeway intersects a railroad corridor. In such cases, the railroad corridor may be privately owned. All of Pinnacle's signs in the case at bar are located at the intersection of an interstate freeway and a railroad corridor.

6. Pinnacle filed one application on February 29, eight applications on April 12, and six applications on April 19.

of-way. Two advertising signs were located within the Interstate 465 right-of-way, in northeast Marion County, because the interstates are not zoned. Current Planning provided a map which showed that the only unzoned areas in Marion County are the interstate rights-of-way. The map also showed the locations of railroad rights-of-way that intersect interstate rights-of-way. There is the potential for many more advertising signs to be located within interstate rights-of-way, without approval or review by the City staff.

We determined that the best way to solve the problem would be to zone the interstate rights-of-way. Attached is a draft of a proposed ordinance to zone the interstate rights-of-way.... If the draft is acceptable, I would like to take the ordinance to public hearing as soon as possible.

\* \* \*

*Appellee's Appendix* at 90. Around this time, Plambeck also sought input from INDOT concerning the draft and was informed by INDOT of the additional permit applications filed by Pinnacle.

Thereafter, on April 26, 2000, a week after Pinnacle filed the last of its applications with INDOT, the DMD officially proposed an amendment to the Zoning Ordinance of Marion County. On April 28, Plambeck circulated the proposed ordinance to various interested parties, including sign companies such as Pinnacle, and informed them that a public hearing on the matter had been scheduled before the Commission on May 17, 2000. In early May, a representative of Pinnacle discussed the proposed ordinance with Michael Graham of the DMD and noted an

apparent problem with the proposed ordinance.

On July 10, 2000, the City–County Council enacted into law a substantially revised version of the proposed ordinance, assigning zoning classifications to the unzoned land in Marion County generally occupied by freeways.[7] Around this same time period, between May 15 and July 14, 2000, INDOT denied all fifteen of Pinnacle's permit applications. Pinnacle appealed the denials and eventually settled with INDOT on June 18, 2001. Pursuant to the settlement, INDOT granted permits for ten of the fifteen permit applications filed by Pinnacle.

Following the settlement, Pinnacle began constructing one of the signs authorized by INDOT, which was located at 1425 Harding Street near I–70 (the Harding Street Sign). Shortly after construction began, the DMD posted an Order to Stop Work (Stop Work Order) dated July 24, 2001. The reason cited on the order was Pinnacle's failure to obtain an Improvement Location Permit for the sign from the City. Pinnacle immediately ceased construction of the Harding Street Sign despite its belief that the Stop Work Order was issued erroneously.

After months of discussions between Pinnacle and the City, on January 15, 2002, Pinnacle filed its Complaint for Declaratory Judgment, seeking a declaration that the amendment to the zoning ordinance was inapplicable to the ten permits filed with INDOT before the amendment was enacted, a declaration that the Stop Work Order was void and unenforceable, and an award of attorney fees. The City filed a Motion to Dismiss on March 4, 2002, which the trial court denied on June 24, 2002. Both parties subsequently filed for summary judgment. Following a hear-

---

**7.** The amendment was codified in the Revised Code of the Consolidated City and County (Indianapolis Rev.Code) as sections 730–100 through 730–103.

ing on the motions for summary judgment, on February 12, 2003, the trial court granted summary judgment in favor of Pinnacle and concluded that Pinnacle was entitled to attorney fees because the City engaged in frivolous, unreasonable, or groundless litigation. The City immediately appealed this order. The City also filed a Motion to Stay, which the trial court denied, on April 3, as to the declaratory judgment but granted as to the award of attorney fees. On motion by Pinnacle, this court dismissed the appeal, on June 30, 2003, as premature because no amount of attorney fees had been awarded and, thus, there was no final judgment. On remand, the parties entered into an agreed stipulation, setting Pinnacle's reasonable attorney fees at $52,978.92. On August 5, 2003, the trial court approved the stipulation and entered a final judgment. The City now appeals. Additional facts will be provided below where necessary.

### 1.

The City initially challenges the entry of summary judgment in favor of Pinnacle. While not raising any disputed issues of material fact, the City contests the order on several legal fronts and argues that it is entitled to summary judgment. We will address each legal argument in turn.

When reviewing a grant or denial of summary judgment, our standard of review is the same as that used by the trial court: summary judgment is appropriate only where the evidence shows there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Embry v. O'Bannon,* 798 N.E.2d 157 (Ind.2003) (citing Ind. Trial Rule 56(C)). Here, there are no factual disputes. "Accordingly, this is a proper case for summary judgment, and our standard of review is de novo." *Freidline v. Shelby Ins. Co.,* 774 N.E.2d 37, 39 (Ind. 2002). Moreover, we observe that we are not bound by the extensive findings and conclusions entered by the trial court in its summary judgment order. *See Malone v. Price,* 755 N.E.2d 213 (Ind.Ct.App.2001). "Instead, we may affirm on any ground or theory supported by the record." *Id.* at 216.

The foundation of Pinnacle's motion for summary judgment was its argument that, under the doctrine of vested rights, it was entitled to have its permit applications evaluated according to all statutes and ordinances in place at the time the applications were filed with INDOT. Thus, Pinnacle claims that the amended ordinance cannot be retroactively applied to the ten signs that have been permitted by the State. The City argues that the doctrine of vested rights is inapplicable in this case because while Pinnacle filed applications with INDOT, it did not apply for a permit from the City.

As a general rule, applicants for a permit have a right to have their applications considered in accordance with the laws in effect when the application is made. *See Knutson v. State,* 239 Ind. 656, 668, 160 N.E.2d 200, 201 (1959) (adopting doctrine of vested rights and observing that doctrine "is consistent with the general rule of law that ordinances or statutes which are substantive in their effect are not retroactive"); *Steuben County v. Family Dev., Ltd.,* 753 N.E.2d 693 (Ind.Ct.App. 2001) (building permit for landfill), *trans. denied; Yater v. Hancock County Bd. of Health,* 677 N.E.2d 526 (Ind.Ct.App.1997) (septic permits); *Indiana Dep't of Envtl. Mgmt. v. Chem. Waste Mgmt. of Ind., Inc.,* 604 N.E.2d 1199 (Ind.Ct.App.1992) (hazardous waste disposal permit), *trans. denied; Bd. of Zoning Appeals of Fort Wayne v. Shell Oil Co.,* 164 Ind.App. 497, 329 N.E.2d 636 (1975) (building permit for gas station). Thus, "[t]he right to use property under prevailing regulations ac-

crues with the application of a permit." *Yater v. Hancock County Bd. of Health,* 677 N.E.2d at 529. In *Shell Oil,* we explained:

> Indiana demands that an application for a permit such as that sought by Shell be decided under the zoning requirements in effect at the time the application is filed. The right to use property *in accordance with prevailing zoning ordinances* accrues upon the filing of an application for a building permit; and an ordinance of substantive character cannot later operate to divest such right.

*Bd. of Zoning Appeals of Fort Wayne v. Shell Oil Co.,* 329 N.E.2d at 642 (citations omitted) (emphasis supplied).

■ The City asserts a novel argument, and one of first impression in Indiana, that the doctrine of vested rights only applies with respect to the governmental unit with which the permit application was filed.[8] We agree with the City's proposition in situations where two or more governmental units concurrently have their own permitting process. Indeed, this is the case under the amended zoning laws with respect to signs constructed on interstate rights-of-way, as a sign company must apply for a permit from INDOT and a permit from the DMD. Thus, under the amended law, a sign company's rights would not vest against the City until an application was filed with the City, irrespective of whether an application had been filed with INDOT. We are confronted here, however, with a much different situation.

At the time Pinnacle filed its applications with INDOT, the City, by its own admission, lacked jurisdiction to issue or require permits for signs on unzoned property. The July 1999 letters to Pinnacle clearly reflect this. When Pinnacle filed its permit applications with INDOT in February and April 2000, nothing had changed and the City still had no similar permitting process in place. In fact, when the last applications were filed with IN-DOT on April 19, the record reveals that the amended ordinance had yet to be proposed to the Commission and was not enacted in its revised form by the City-County Council for nearly three more months. Thus, any attempt to apply for a permit from the City on or before April 19, 2000 would have been futile because the land remained unzoned. As Stephen Spencer testified, if Pinnacle had come and filed these applications at that time, he might have thought it somewhat "odd" because it would be "unnecessary" in light of the policy expressed in the July 1999 letters. *Appellee's Appendix* at 182. Spenc-

---

**8.** Pinnacle asserts that this is not an issue of first impression in Indiana, citing to *Indiana Dep't of Envtl. Mgmt. v. Chem. Waste Mgmt. of Ind., Inc.,* 604 N.E.2d 1199. While *Chemical Waste* is relevant, we do not believe that it directly addressed the issue presented in this case. In *Chemical Waste,* a company applied for a hazardous waste disposal permit from IDEM. This permit is required by the federal Resource Conservation and Recovery Act (RCRA), and the federal government has authorized IDEM to administer and enforce the RCRA program through the State's regulations. While the company's application was pending for a number of years, the Indiana General Assembly enacted a new law, the Character Law, requiring applicants for such permits to disclose certain information and allowing applications to be denied on a variety of bases. IDEM announced that it intended to apply the Character Law to the pending application, but we held that "the Character Law could not be retroactively applied to Chemical's application which had long been pending when the law went into effect." *Id.* at 1205. The fact that two different governmental units may have been involved in the permitting process was not addressed in *Chemical Waste,* as the holding did not turn on which governmental unit enacted the new law. Moreover, that case dealt with the doctrine of vested rights with regard to the same application filed with one permitting authority, IDEM.

er further testified that he would have likely responded with letters consistent to the July 1999 letters.[9]

Under the specific circumstances presented in the instant case, we conclude that the vested rights doctrine applies to estop the City's belated effort to acquire jurisdiction over construction of the signs in question. Consistent with the doctrine, a property owner should have the ability to survey the zoning laws as they exist at a particular time and determine with certainty which permitting authorities require an application. Once a property owner applies for the relevant building permits under the prevailing zoning laws, the owner's rights vest as against other government units who subsequently attempt to intervene by enacting laws to assert jurisdiction (i.e., to require permits) over the subject matter of the pending permit applications. As our supreme court observed in a slightly different context, "A government which exercises such police power over the property of its citizens without any fixed standards which are known to the citizens and the enforcing officials is a government by men, and not by law." *Knutson v. State*, 160 N.E.2d at 202.

■ The City alternatively argues that even if the doctrine of vested rights applies in this instance, the law in existence at the time Pinnacle applied for permits from INDOT forbade the erection of billboards on unzoned land. Over two years after the July 1999 letters and just before Pinnacle initiated litigation, the City notified Pinnacle that it now believed that the position

expressed in the July 1999 letters was incorrect, as the City had previously not recognized the applicability of Indianapolis Rev.Code § 730–505(a)(1). The City argues that § 730–505(a)(1) applies to both unzoned land and zoned land.

■ Interpretation of a zoning ordinance is a question of law. *Discovery House, Inc. v. Metro. Bd. of Zoning Appeals*, 701 N.E.2d 577 (Ind.Ct.App.1998), *trans. denied.* When we interpret the language of a zoning ordinance, we follow the ordinary rules of statutory construction. *Johnson Oil Co., Inc. v. Area Plan Comm'n of Evansville & Vanderburgh County*, 715 N.E.2d 1011 (Ind.Ct.App. 1999). We interpret the ordinance as a whole and give its words their plain, ordinary, and usual meaning. *Id.* All language is deemed to have been used intentionally. *Preston v. State*, 735 N.E.2d 330 (Ind.Ct. App.2000). Zoning regulations that inhibit the use of real property, however, are in derogation of the common law and are to be strictly construed. *Discovery House, Inc. v. Metro. Bd. of Zoning Appeals*, 701 N.E.2d 577.

Indianapolis Rev.Code § 730–505, entitled "Civil zoning violations", provides in relevant part:

(a) It shall be unlawful for any person who is the owner or contract vendee of, or who has a possessory interest in, real property located in Marion County to cause, suffer or allow any of the following civil zoning violations to occur on such property:

**9.** While we need not decide the issue, we observe that Pinnacle also presents a persuasive argument that the City should be estopped from arguing the inapplicability of the doctrine of vested rights based on Pinnacle's failure to apply for permits from the City. As the facts clearly reveal, the City advised Pinnacle in unequivocal terms that it lacked jurisdiction over signs on unzoned property and, with regard to such unzoned property, directed Pinnacle to seek improvement location permits from INDOT. The City, in essence, now asserts that Pinnacle should be penalized for heeding the City's advice and not engaging in the futile act of applying for permits from the City at the same time it filed with INDOT.

(1) The location, erection, or maintenance of any sign not specifically permitted by Chapter 734 of this Code;

\* \* \*

We initially ponder how a civil zoning violation could occur from the erection of a sign on unzoned property. The City does not satisfactorily answer this question. Moreover, an examination of Chapter 734, which provides the numerous sign regulations for Marion County, reveals that Chapter 734 governs only signs located within zoning districts in Marion County. *See* Indianapolis Rev.Code § 734–101 ("[t]he regulations of this chapter shall apply to the location, erection, and maintenance of signs in all zoning districts within Marion County, Indiana"); Indianapolis Rev.Code § 734–200 ("[t]he requirements, conditions, prohibitions and exception specified in Chapter 730 of this Code shall apply to all signs and sign structures in all zoning districts in Marion County, Indiana"). Reading § 730–505(a)(1) together with Chapter 734, it is clear that § 730–505(a)(1) applies only to signs within zoning districts in Marion County. As it is undisputed that Pinnacle's proposed signs were not within a Marion County zoning district at the time the permit applications were filed with INDOT, § 730–505(a)(1) has no application in the instant case. The trial court properly granted summary judgment in favor of Pinnacle.

2.

We now turn to the award of attorney fees. The City argues that attorney fees cannot be assessed against a governmental unit. Moreover, the City asserts that it acted in good faith in litigating a case that

the trial court itself described as one of first impression.

■ With regard to the City's assertion of immunity, we observe that the City did not timely present the applicability or inapplicability of I.C. § 34–52–1–1 to governmental entities as an affirmative defense before the trial court.[10] While we recognize the general policy against assessing penalties and attorney fees against a governmental entity, we cannot address the applicability of that policy in regard to I.C. § 34–52–1–1 in this case. *See Cox v. Rome City,* 764 N.E.2d 242 (Ind.Ct.App. 2002). "Any affirmative defense that a party seeks to assert must be included in the pleadings when a responsive pleading is necessary." *Id.* at 249. Failure to do so results in waiver. *Cox v. Rome City,* 764 N.E.2d 242. Therefore, the City's claim of immunity fails, and we turn to whether the City engaged in conduct justifying an award of attorney fees.

■ I.C. § 34–52–1–1 governs the award of attorney fees for litigating in bad faith or for pursuing frivolous, unreasonable, or groundless claims. It provides in relevant part:

(b) In any civil action, the court may award attorney's fees as part of the cost to the prevailing party, if the court finds that either party:

(1) brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless;

(2) continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable, or groundless; or

(3) litigated the action in bad faith.

A defense is "frivolous" if it is made primarily to harass or maliciously injure an-

---

**10.** The City first raised this argument on April 3, 2003, in its Reply Brief in Support of Motion for Stay.

other, if counsel is unable to make a good faith and rational argument on the merits of the action, or if counsel is unable to support the action by a good faith and rational argument for extension, modification, or reversal of existing law. *Brademas v. South Bend Cmty. Sch. Corp.*, 783 N.E.2d 745 (Ind.Ct.App.2003), *trans. denied*. A defense is "unreasonable" if, based upon the totality of the circumstances, including the law and the facts known at the time, no reasonable attorney would consider the defense justified or worthy of litigation. *Id.* Finally, a defense is "groundless" if no facts exist which support the claim relied upon and supported by the losing party. *Id.* An award of attorney fees is not justified merely because a party loses on the merits. *Id.*

When reviewing an award of attorney fees under Indiana Code section 34–52–1–1, we first review the trial court's findings of fact under a clearly erroneous standard and review the legal conclusions of the trial court de novo. Finally, we review the trial court's decision to award attorney fees and the amount thereof under an abuse of discretion standard. An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law.

*Brademas v. South Bend Cmty. Sch. Corp.*, 783 N.E.2d at 750 (citations omitted).

■ The trial court made the following findings and conclusions with regard to the award of attorney fees:

5.  Ind.Code § 34–52–1–1 permits the "prevailing party" to recover attorney's fees if a party either "brought" a defense on a claim that is frivolous, unreasonable, or groundless or "continued to litigate" a defense after it became frivolous, unreasonable, or groundless.

6.  The following undisputed facts, among others, demonstrate that the Development Commission and the DMD are engaging in frivolous, unreasonable, or groundless litigation.

    a.  When first confronted with the issue of whether outdoor advertising signs are authorized on unzoned property in Marion County, the DMD carefully studied the issue and advised Pinnacle that the DMD **"lacks jurisdiction to issue, or to require an improvement location permit"** on unzoned property in Marion County.

    b.  When the DMD understood the practical application of its statement . . ., it rushed to enact the Amendment. **Before** the Amendment was enacted, however, Pinnacle had submitted permit applications to INDOT to build another fifteen (15) outdoor advertising signs in Marion County, ultimately acquiring ten (10).

    c.  When Pinnacle started to build the first of the ten (10) outdoor advertising signs, the DMD issued the Work Stop Order stopping construction. The DMD issued the Work Stop Order even though Pinnacle had provided the DMD with legal authority demonstrating that the Amendment did not apply to the ten (10) permits acquired from INDOT. Pinnacle even met with the legal counsel for the Development Commission and the DMD and **personally** handed them the legal research.

    d.  Once Pinnacle initiated this lawsuit, the Development Commission and the DMD reversed their position and argued that the Amend-

ment was not necessary to halt Pinnacle's efforts. Instead, they argued that outdoor advertising signs have **always** been prohibited on unzoned property in Marion County. In their argument to this Court, the Development Commission and the DMD labeled Stephen Spencer as a bureaucratic know nothing, claiming that the Amendment simply reiterated the long standing prohibition on outdoor advertising signs in Marion County. All along, however, the Development Commission and the DMD knew this argument was inaccurate. In March of 2000, the Director of the DMD, Maury Plambeck, authored an internal Memorandum in which he acknowledged that Pinnacle had tapped into an area where **"There is the potential for many more advertising signs to be located within interstate rights-of-way, without approval or review by the City staff."**

*Appellant's Appendix* at 19–20 (emphases in original).

The facts cited by the trial court are for the most part accurate. We would note, however, that the City informed Pinnacle of its belated discovery of Indianapolis Rev.Code § 730–505 and its interpretation of the provision's applicability to the situation at hand on October 1, 2001, after litigation had been threatened but three months before Pinnacle commenced litigation. Moreover, we cannot agree that the record reflects the City knew all along that this argument was inaccurate, as Plambeck (not yet the Director of the DMD) authored the internal memorandum cited by the trial court in March 2000, before all but one of the applications had been filed with INDOT and well before litigation had been threatened or the City had considered the applicability of § 730–505. This

obscure loophole found by Pinnacle had not previously been recognized or dealt with by the City. Therefore, the City should be given some leeway in determining how to defend this case and should not be limited to presenting only its initial position articulated before the issue had been fully developed in litigation.

That leaves us with the fact that the DMD issued the Stop Work Order even though Pinnacle had provided the City with legal authority (*Yater* and *Shell Oil*) concerning the doctrine of vested rights, which Pinnacle asserted was controlling. Further, two months prior to initiating litigation, Pinnacle's counsel met with Plambeck (then Director of the DMD) and counsel for the City and provided them with a copy of the *Chemical Waste* case. Despite the fact that Pinnacle explicitly presented the City with its position that it had obtained a vested right, the City was not required to bow to Pinnacle's interpretation of the law. The application of the doctrine of vested rights in this unusual context had not been addressed in Indiana and the cases supplied by Pinnacle were not directly on point. While the City ultimately lost on the merits, its defense that the doctrine does not apply between governmental units was not unreasonable, frivolous, or groundless.

We conclude that the trial court abused its discretion by awarding attorney fees to Pinnacle. We reverse that portion of the judgment, and affirm the award of summary judgment in favor of Pinnacle.

Judgment affirmed in part and reversed in part.

KIRSCH, C.J., and BARNES, J., concur.