STORY BED & BREAKFAST, LLP,
Appellant (Plaintiff below),

v.

BROWN COUNTY AREA PLAN
COMMISSION, Appellee
(Defendant below),

and

Patricia N. March, Appellee
(Intervener–Defendant
below).

No. 07S01–0402–CV–53.

Supreme Court of Indiana.

Dec. 16, 2004.

Steven K. Emery, Holly M. Harvey, Bloomington, IN, for Appellant.

David B. Schilling, Bloomington, IN, Michael A. Mullett, Indianapolis, IN, for Appellees.

Karen L. Arland, Indianapolis, IN, for Amicus Curiae Indiana Municipal Lawyers Association.

BOEHM, Justice.

We hold that covenants imposed by the Brown County Area Plan Commission as conditions for approval of a planned unit development are enforceable against a subsequent purchaser of property subject to the PUD.

### Factual and Procedural Background

The property involved in this case originally consisted of approximately twenty-two acres containing a restaurant and mill in an area zoned for commercial use, and a number of houses used as rental and boarding units in areas zoned for residential use. In 1986, Story Group Inc. requested the Brown County Plan Commission and the County Commissioners to designate over seven acres as a Planned Unit Development (PUD) to permit operation of a "bed and breakfast" which would take guests by reservation only.[1] After a hearing, Story Group and the Plan Commission met in a "work session" in which they discussed sixteen proposed restrictions on the property. The Plan Commission's "Primary Approval" on June 24, 1986 recited that Story Group's proposed plat "is granted primary approval subject to the following conditions: See list of covenants attached ..." The attached "covenants" listed fourteen provisions from the work session, including "(3) No outside loud speakers or audio equipment will be used for any reason what so ever [sic]," "(4) No overnight camping will be allowed within the PUD or in any of it's [sic] parking areas," "(5) No excess noise or excess lighting shall be allowed and all exterior lighting will be ... turned off at 10:00 P.M.," and "(10) The owner agrees to obtain all necessary State and Local permits, inspections, approvals and license [sic]." On September 23, 1986, the Plan Commission recommended secondary approval "subject to covenants as approved in Primary hearing." Subsequently, the Brown County Board of Commissioners unanimously approved the PUD "as submitted with covenants."

The PUD was modified in 1992 to include the entire twenty-two acre tract of land, but retained essentially the same provisions. The Plan Commission unanimously gave "primary" and "secondary" approval of the 1992 application subject to four additional "conditions" and "[s]ubject to the previously approved covenants." The "covenants" from both the 1986 and 1992 approvals were retained in the Plan Commission's office and were available for

---

1. Prior to the 1986 PUD application, according to the Plan Commission minutes, Story Group's use of the property was without licensing and in violation of the applicable zoning restrictions in several respects.

inspection, but were never recorded in the office of the county recorder.

Story Group Inc. went into receivership on December 6, 1998, and on that date Frank Mueller took possession of the Story Property. Mueller and Rick Hofstetter, two individuals who had no affiliation with Story Group, Inc., have been operating the property in one form or another ever since. The record does not make clear Mueller's and Hofstetter's initial arrangement, but it is clear that Dubois County Bank, a mortgagee of the Property, acquired title at a sheriff's sale on February 14, 1999 and deeded it to Mueller on May 18, 1999. On August 3, 1999, Mueller transferred the property to Story B & B, LLP ("B & B"), a partnership of Hofstetter and Mueller. Prior to the bank's transfer to Mueller, Mueller and Hofstetter were aware that the property was designated a PUD, but were apparently unaware of the specific requirements.[2] No one from B & B contacted the Plan Commission's office to inquire about the PUD or made any other effort to discover any possible conditions attached to the PUD approval.

Between December, 1998, and September, 1999, B & B expended more than $100,000 in improvements on the Story Property, including repairing leaking roofs, rotting floors, and electrical problems, removing lead based paint, increasing cooler space in the kitchen, conversion of the mill on the property to a bar and grill, and construction of a wooden deck designed for dining, an outdoor public restroom and a storage addition to the mill. In that process, beginning at least

on May 3, 1999, B & B asked Doug Harden, then acting Director and Building Inspector for the Plan Commission, for assistance in securing permits from the State to construct a new septic field. On May 4, 1999, Mueller applied for a building permit from the Plan Commission. Joan Wright became director of the Plan Commission and of the Brown County Area Board of Zoning Appeals at some point between May and September 1999. According to her, although B & B received building and septic permits, it failed to obtain "improvement location permits or certificates of occupancy for the bar and grill or for the outdoor food preparation facility."

In September, 1999, Wright sent B & B a copy of the PUD restrictions under cover of a letter stating that the "PUD does not permit use of the Mill building as a bar and grill. It is designed as a shop/Office/B & B unit and any other use of the building violates the terms of the PUD. Further, *any* use of or on the property which is not specified in the PUD violates the conditions of approval." In May 2000, Wright advised B & B that the PUD also contained prohibitions against "primitive camping" and amplified music. At least since the spring of 2000, B & B has hosted a number of events on the property throughout the year including Story Fest in the spring and October Fest in the fall. In 2000, Story Fest drew 1,500–2,000 people and October Fest doubled that attendance. These festivals involved bringing in artists and musicians for a day of music, arts and crafts, food, and libations. After the 2000 Story Fest the Plan Commission

2. In April, 1999, Doug Harden, the Director of the Plan Commission and building inspector, met with Hofstetter regarding septic system design for the Story Property and informed Hofstetter that the Story Property had been granted PUD approval by the Plan Commission and the County Commissioners. May 4, 1999, Mueller applied to the Plan Commission for an improvement location or building permit stating that B & B sought to build an addition to the mill to be used for storage and restrooms. The application states that the property is a PUD.

received complaints from B & B's neighbors that the festival included amplified music audible from neighboring properties, used a portion of the grounds as an amphitheater, used a building designated as a picnic shelter as a stage, and allowed overnight camping.

In April 2001, B & B filed a Petition for Declaratory Judgment and sought a preliminary injunction against the Plan Commission's enforcement of the requirements of the PUD. After one half day the hearing was adjourned without resolution due to the court's other scheduled commitments. In May 2001, a neighbor of the property, Patricia March, was granted leave to intervene in the dormant lawsuit. The Plan Commission then counterclaimed for declaratory judgment and moved for summary judgment. B & B responded with its own motion for summary judgment. The parties' contentions focused on the terms "conditions" and "commitments" as they appear in the PUD statutes explained below. The Plan Commission argued that the Story Property was subject to the PUD, that the restrictions in the PUD constituted valid "conditions," and that B & B was in violation of these conditions. B & B asserted that the restrictions were "commitments," and under the applicable statute, were not enforceable against B & B because they were not recorded. In the alternative, B & B contended that the Plan Commission was estopped from enforcing the PUD by reason of its grant of the building permit.

In the meantime, in preparation for October Fest 2001, B & B spent an additional $250,000 on musicians, artists, and advertising. In an attempt to comply with the PUD covenants, B & B planned to end the music at October Fest 2001 at 9:50 p.m., place speakers inside the barn that housed the stage, provide shuttle service to alleviate traffic congestion, add security, and disallow overnight camping. October Fest 2001 then proceeded without interference.

After a December hearing on the cross motions for summary judgment, the trial court found that most of the PUD restrictions at issue were phrased as directives, but observed that some others were phrased as "agreements" by the developer.[3] The trial court ruled that at least the restrictions framed as directives were "conditions" and therefore did not need to be recorded. The trial court found that questions of fact remained as to what the Plan Commission discovered during the inspection of the property pursuant to the issuance of the improvement location permit, what B & B told the Plan Commission, and what representations, if any, were made by the Plan Commission at that time. Accordingly, the trial court left for trial whether the Plan Commission was equitably estopped from enforcing the restrictions against outdoor food preparation and use of the mill as a grill and tavern. The trial court left for trial whether the conditions were required to be recorded pursuant to the Brown County ordinance discussed below, whether this requirement prohibits enforcement of the restrictions, and whether B & B has violated the PUD. At B & B's request the trial court certified its order on summary judgment for interlocutory appeal.

The Court of Appeals concluded that it was impossible to draw a meaningful line

---

3. *Compare* covenants number (3) "No outside loudspeakers or audio equipment will be used for any reason what so ever;" (4) "No overnight camping will be allowed within the PUD or in any of its parking areas;" and (5) "No excessive noise or excess lighting shall be allowed ... The outside lights to be turned off at 10 p.m.;" *with* (2) "The developers agree to follow through with the PUD site plan layout concepts and to complete all work in a professional manner."

between "conditions" and "commitments" and focused on whether B & B had reasonable notice of the land use restrictions. *Story Bed & Breakfast, LLP v. Brown County Area Plan Comm'n,* 789 N.E.2d 13, 17–18 (Ind.Ct.App.2003). The Court of Appeals held that placing the restrictions in the minutes of the plan committee meetings did not provide B & B reasonable notice and therefore the restrictions were unenforceable. *Id.* at 20. Clarifying its earlier holding on rehearing, the Court of Appeals rejected the Plan Commission's claim that B & B's knowledge of the PUD designation put B & B on inquiry notice of the specific terms of the conditions. *Story Bed & Breakfast, LLP v. Brown County Area Plan Comm'n,* 794 N.E.2d 519, 523 (Ind.Ct.App.2003). We granted transfer. *Story Bed & Breakfast, LLP v. Brown County Area Plan Comm'n,* 812 N.E.2d 793 (Ind.2004).

## I. Planned Unit Developments

Traditional or "Euclidean" zoning, named for *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), divides municipalities into rigid districts. Each district or zone is dedicated to a particular purpose, which appears on the municipality's official zoning map and is incorporated into the local zoning regulations. Under these early ordinances, anyone could refer to the official zoning map and find the zone for each property and the height, bulk, and use restrictions applicable in that zone.

While this type of zoning has the advantage of predictability, that certainty comes at a price: "Traditional zoning has had the virtue of certainty and the handicap of rigidity." *Town of Schererville v. Vavrus,* 180 Ind.App. 500, 505 n. 1, 389 N.E.2d 346, 348 n. 1 (1979). Zoning has been criticized as producing "cookie cutter" developments populated with structures nearly identical in style, setback, and lot size. *Frankland*

*v. City of Lake Oswego,* 267 Or. 452, 517 P.2d 1042, 1047 (1973). A planned unit development (PUD) is a device used to permit amendment of an existing zoning ordinance for a designated property. 101A C.J.S. *Zoning and Land Planning* § 42 at 157 (1979). PUDs are designed to allow municipalities to adopt "a flexible approach to zoning with the opportunity to shift density to developable portions of a property or to mix residential, commercial, and even industrial uses.... [T]he [PUD] district, once established, constitutes a separate zoning district in addition to the more conventional types of zoning districts." 1 E.C. Yokley, *Zoning Law and Practice* § 6–1 (4th ed.2000).

### A. *Indiana Statutes Governing PUDs*

In the 1970s, local legislative bodies began including PUD regulations in local ordinances. *See generally Vavrus,* 180 Ind.App. 500, 389 N.E.2d 346. The General Assembly first addressed PUDs in 1982 when section 713 was added to the statutes governing subdivisions. That section, since repealed, provided that local legislative bodies could allow PUDs which "may deviate in certain respects from the standards prescribed by the subdivision control ordinance." Ind.Code § 36–7–4–713 (1986) (added by Acts 1982, P.L. 211, § 15). Effective September 1, 1986, the General Assembly included PUDs as one type of zoning ordinance classification. I.C. § 36–7–4–601(d)(4). Also in September 1986, section 613 was added to the Code. Section 613(a) provided that a "plan commission may permit or require the owner of a parcel of property to make a written commitment concerning the use or development of that parcel." Section 613(b) provided that "commitments" must be recorded in order to bind subsequent purchasers without actual knowledge. In 1996, section 713 was replaced by the "1500 SERIES–PLANNED UNIT DE-

VELOPMENT." *See* I.C. § 36–7–4–1500 et seq. (1997) (effective Jan. 1, 1996). Section 1505(c) states "the legislative body shall adopt and amend a PUD district ordinance in the same manner as a zone map change." The Code requires the legislative body to provide written notice and a hearing on the proposal for a zone map change. I.C. § 36–7–4–608.5. If approved "[z]one maps incorporated by reference into the zoning ordinance are not required to be printed in the code of ordinances, book, or pamphlet printed under this section, but the plan commission shall keep them available at its office for public inspection." I.C. § 36–7–4–610(c). Therefore, a PUD approval need not be recorded, but the plan commission must keep it available at its office for public inspection. In 1996, the General Assembly limited section 613 to development plans, and added 615 governing PUD commitments. Section 615(c) provides "An unrecorded commitment is binding on a subsequent owner of the parcel or a person acquiring an interest in the parcel only if the subsequent owner or the person acquiring the interest has actual notice of the commitment." Subsection 1512(a) provides that the legislative body of a unit, in adopting a district ordinance for a PUD, may:

(1) Impose reasonable conditions on a proposed planned unit development.

(2) Condition issuance of an improvement location permit on the furnishing of a bond or a satisfactorily written assurance guaranteeing the timely completion of a proposed public improvement in a planned unit development or serving a planned unit development.

(3) Allow or require an owner of real property to make a written commitment in the manner authorized under section 614 or 615 of this chapter.

Subsection 1512(b) provides that legislative body, in recommending a PUD district ordinance, may:

(1) impose the conditions described in subsection (a)(1) and (a)(2); and

(2) allow or require a written commitment as authorized under section 614 or 615 of this chapter.[4]

The parties do not base any contention on the fact that the 1500 series was enacted and section 613 was repealed after the PUD approvals but before B & B acquired the property.

The Plan Commission acknowledges that section 615(c) requires recording of commitments, but contends that unrecorded "conditions" may nonetheless be binding on subsequent purchasers because they are "other land use restrictions created in accordance with law" which by the express terms of section 613(c) were unaffected by section 613(b). The Plan Commission also argues that section 1512 contemplates both "conditions" and "commitments" but only the latter are required to be done "as authorized under section 614 or 615," which requires recording to be effective against persons without actual knowledge.

Section 613(c), now amended, provided that "This section does not affect the validity of any covenant, easement, equitable servitude, or other land use restriction created in accordance with law." Section 921(e) of the local planning and zoning sections of the Code deals with variances. It provides that "[c]onditions imposed on

4. Prior to I.C. § 36–7–4–101 section 613 applied to "advisory planning," "area planning" and "metropolitan development." Currently, section 614 applies to "metropolitan" plan-

ning and 615 to "advisory area" planning. The Plan Commission is "advisory" pursuant to Indiana Code section 36–7–1–2.

the granting of an exception, a use, or a variance are not subject to the rules applicable to commitments." I.C. § 36–7–4–921(e). Both parties agree that if a legislative body imposes the restriction, it is a condition, but if it is submitted by the property owner to induce rezoning, it is a commitment. The Court of Appeals found no intelligible distinction between these terms and declined to attach any significance to them. *Story*, 789 N.E.2d at 18. We conclude that the legislative distinction between commitments and conditions must be given effect. In short, the Court of Appeals is correct that the distinction is murky, but the terms have been given meaning in practice, and although it may be desirable, recording of conditions is not required. Property being used other than in compliance with the general zoning ordinance may be subject to a variance or PUD, which amounts to an exception to the ordinance. *Citizens for Mt. Vernon v. City of Mt. Vernon*, 133 Wash.2d 861, 947 P.2d 1208, 1215 (1997) (rezoning is the legal effect of approving a PUD); Madelker, *Land Use Law* §§ 9.24–9.30 (Lexis Law Pub.1997) (a PUD is developed free from most specific zoning regulations and usually as a separate zoning district). Whether the legislative body rezones or allows a variance or PUD, "conditions" imposed on that action need not be recorded and thus require the purchaser to examine the records of the relevant agency to discover them.

### B. *The Story PUD*

On May 1, 1989, the Brown County Board of Commissioners passed a zoning ordinance which included provisions governing PUDs. In 1996, Indiana Code section 36–7–4–1504 was enacted and expressly authorized local regulations for PUDs in general as long as they meet the requirements of the 1500 Series—Planned Unit Development. Under that statute, the Brown County PUD ordinance was the "exclusive means for exercising zoning control over [PUDs]". I.C. § 36–7–4–1504(c). All parties agree that the 1992 Story PUD approval was governed by the Brown County PUD ordinance and the subsequently enacted 1500 Series. The Brown County Zoning Ordinance defines a Planned Unit Development as:

> [A] tract of land proposed to be developed for five (5) or more residential, commercial, or industrial uses or structures, or combinations thereof, (which includes any multi-unit structure with five or more units the intended uses of which are identical), which are planned and developed as a whole under single or joint ownership for the purpose of selling, leasing, renting or conveying individual lots, units, or structures in the future.

The Story Group's 1986 request to rezone the Story Property as a PUD was resisted by Brown County residents who were concerned about noise, traffic, and change of the character of their community. Balancing against these concerns was the written description of the layout and concept of the proposed Story Property PUD submitted by the Story Group including that:

> The principle [sic] focus in the past and for the future, is less people in Story not more. If the petitioners were limited to their present resources the emphasis would have to be to build a volume business in the restaurant thus increasing traffic. With the projected development the objectives will be to require reservations for dinner and overnight guests and constructing fewer yet more comfortable and exclusive lodging units. Fewer people are easier to control.

Similarly, in the course of a May 27, 1986 public hearing on Story Group's request for PUD designation, Story Group presented the Plan Commission with a second

written description of the layout and concept of the requested PUD, including the following passage:

> A principle [sic] objective in this development is to focus on more exclusive and sophisticated services for fewer people rather than, for example, opening the restaurant and gift shop to as many people as advertising can bring in. Current and projected policy, also, is "reservation only" for dinner and overnight guests, again reducing the number of people in Story at any given time.

To preserve this tranquil atmosphere, the Plan Commission chose to impose covenants documented in its "Primary Approval of Planned Unit Development," dated June 24, 1986. The Plan Commission kept this document along with all others relating to the Story Property's PUD designation in its office. The Board of Commissioners kept its copy of the Story PUD documents in the County Auditor's office. In 1992, the Plan Commission recommended approval of a second PUD which retained most restrictions, eliminated a few not relevant here, and added some others, including that the deck would remain unroofed and have no food service. Again, the Plan Commission document referred to these as "conditions." These, like their 1986 predecessors, were unrecorded but were retained in the Plan Commission office.

### C. *The Legal Status of the Story Restrictions*

All agree that the Story Property is a PUD, that its approval with covenants was designed to protect adjacent properties, and that these restrictions applied to the property in the hands of Story Group, its original developers. The issue is whether B & B is also bound by the same covenants. The trial court granted summary judgment to the Plan Commission and against B & B on the question whether these covenants applied to B & B as a successor of Story Group.

B & B argues that summary judgment is improper because the status of the restrictions turns on a disputed question of fact. Some of the restrictions use the term "agree," which B & B contends implies an agreement existed. B & B argues that this implies that all of the restrictions were part of a "commitment" made by Story Group and therefore were required to be recorded to be effective against subsequent purchasers. The trial court agreed as to some of the restrictions, but found as a matter of law that nine of them, including numbers 3, 4, and 5 were conditions.

Neither case law nor the statute provides a definition of either "condition" or "commitment." The Plan Commission asserts that the trial court properly concluded that at least nine of the restrictions were "conditions" imposed by the county pursuant to Indiana Code section 36–7–4–1512(b)(1) rather than "commitments" tendered by the landowner pursuant to Indiana Code section 36–7–4–1512(b)(2). The approvals do not contain the term "commitments." Moreover, the 1986 Plan Commission approval itself states that the PUD is granted "subject to the following conditions," as do the minutes of the Plan Commission meeting in which the 1992 PUD was approved. The character of the restrictions does not turn solely on the label that the Plan Commission chooses to place on them. However, restrictions number 1, 3, 4, 5, 6, 8, 11 and 12 are phrased as directives not as agreements, and the Plan Commission treated them as conditions of approval that could be enforced against subsequent owners even if not recorded. The Plan Commission thus drew two legal conclusions: First, it was permissible to have enforceable conditions

without recording them, and, second, that these restrictions were in that category. Two amici curiae, the Indiana Association of Cities and Towns and Indiana Municipal Lawyers Association, without supporting evidence, state that the practice of imposing conditions on PUD approvals is widespread. The administrative construction of the agency's own documents and statute is entitled to weight. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Healthscript, Inc. v. State,* 770 N.E.2d 810, 814 (Ind.2002) (noting the scholarly debate over *Chevron's* application to administrative statutes that are criminally enforceable); *LTV Steel Co. v. Griffin,* 730 N.E.2d 1251, 1257 (Ind.2000) ("An interpretation of a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless this interpretation would be inconsistent with the statute itself."). The wisdom of distinguishing conditions from commitments in this respect is a matter for the legislature. We conclude, as the trial court did that, the Indiana statutes governing PUDs do not require that conditions attached to approval of a PUD be recorded in the recorder's office to be effective against subsequent purchasers as long as the conditions are available as public records. Rather, they are in the nature of zoning ordinances which are effective against the public at large.

### D. *Bona Fide Purchaser*

 Apart from whether unrecorded PUD conditions are enforceable against bona fide purchasers, B & B was not a bona fide purchaser without notice. In order to qualify as a bona fide purchaser, one must purchase in good faith, for valuable consideration, and without notice of the outstanding rights of others. *John v. Hatfield,* 84 Ind. 75, 81–82 (1882). The law recognizes both constructive and actual notice. *Altman v. Circle City Glass Corp.,* 484 N.E.2d 1296, 1298 (Ind.Ct.App. 1985); *Keybank Nat'l Ass'n v. NBD Bank,* 699 N.E.2d 322, 327 (Ind.Ct.App.1998). It is undisputed that B & B had actual notice that the Story Property was zoned as a PUD before the property was purchased. Furthermore, it is undisputed that the conditions were properly included as an element of the PUD approval. Property owners are charged with knowledge of ordinances that affect their property. *See Texaco, Inc. v. Short,* 454 U.S. 516, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982); *Bd. of Zoning Appeals v. Leisz,* 702 N.E.2d 1026, 1030 (Ind.1998); *Advisory Bd. of Zoning Appeals of Hammond v. Found. for Comprehensive Mental Health, Inc.,* 497 N.E.2d 1089, 1093 (Ind.Ct.App.1986); *Mitchell v. Chernecki,* 286 Or. 285, 593 P.2d 1163, 1165–66 (1979). The creation of a PUD is a legislative act and PUD provisions are zoning ordinances. *South Creek Assoc. v. Bixby & Assoc.,* 781 P.2d 1027, 1032 (Colo.1989) ("A PUD enabling ordinance is a legislative enactment. A PUD plan adopted and approved pursuant to such an ordinance constitutes a form of rezoning for the area included within the PUD."); *Levitt Homes, Inc. v. Old Farm Homeowners' Ass'n,* 111 Ill.App.3d 300, 67 Ill.Dec. 155, 444 N.E.2d 194, 202 (1982) (PUDs allow greater flexibility in development than is available under general zoning ordinances); *Nesbit v. City of Albuquerque,* 91 N.M. 455, 575 P.2d 1340, 1343 (1977) (approval of PUD plan constitutes a zoning restriction); *State ex rel. Comm. for the Referendum of Ordinance No. 3844–02 v. Norris,* 99 Ohio St.3d 336, 792 N.E.2d 186, 190–91 (2003) (approval of the PUD plat was a legislative act because the specific zoning restrictions in the PUD area were only upon approval of the plat); *Peachtree Dev. Co. v. Paul,* 67 Ohio St.2d 345, 423 N.E.2d 1087, 1092 (1981) (both the

creation and implementation of a PUD are legislative acts because they are the functional equivalent of traditional legislative zoning); *Erb v. Common Council of Eugene,* 22 Or.App. 497, 539 P.2d 1125, 1127 (1975) (PUDs are "included in many zoning ordinances because they present a method of achieving flexibility"); *In re Stowe Club Highlands,* 164 Vt. 272, 668 A.2d 1271, 1275 (1995) (PUDs merge zoning and subdivision requirements).

In *Bixby,* a developer gained approval of a PUD which, among other things, provided guidelines for the use of a parking lot within a developed area. 781 P.2d at 1028. The PUD was not recorded in the recorder's office. However, a subdivision agreement recorded in the recorder's office stated, "development of this subdivision is controlled by an approved [PUD] approved by the Planning Board." *Id.* A subsequent purchaser of a shopping center within the PUD area argued that it was not subject to the PUD guidelines because it did not have actual knowledge of the PUD or its guidelines before it purchased the property. The Colorado Supreme Court held that because the "PUD plans have their source in public approval processes prescribed in legislative enabling enactments" they did not need to be recorded in order to be enforceable against a subsequent purchaser of land within the PUD. *Id.* at 1032. "Because the PUD plan is equivalent to a rezoning provision approved pursuant to the public process prescribed by Boulder's PUD ordinance, subsequent purchasers as well as other members of the public are bound by the plan provisions." *Id.* at 1033. In this case, B & B had actual knowledge that the Story Property was a PUD. B & B is therefore charged with knowledge of the unrecorded restrictions in the PUD.

The Plan Commission's and Brown County Commissioners' records relating to the Story PUD approval are public records open to public inspection. I.C. §§ 5–14–3–2, 5–14–3–3 (1983). B & B never attempted to view these records, and B & B conceded in the trial court that it had no evidence that the Story PUD approval conditions were not available for inspection in the Plan Commission or Brown County Commissioner offices. B & B, with knowledge that the property was a PUD, and charged with knowledge that "conditions" had been or could have been imposed and might not be of record, failed to examine the publicly available records. B & B's actual knowledge of the PUD approval put B & B on inquiry notice of the use and development conditions.

## II. Brown County Zoning Ordinance

B & B's primary contention is that the restrictions contained in the PUD are not "conditions" and therefore are not enforceable against it because it purchased the property without knowledge or notice of the restrictions. However, the trial court sua sponte raised the issue of whether the Brown County Zoning Ordinance required that the conditions be recorded and denied complete summary judgment because " . . . sufficient ambiguities exist to require evidence at trial on the meaning of the zoning ordinance."

Interpretation of a zoning ordinance is a question of law. *Metro. Dev. Comm'n v. Pinnacle Media, L.L.C.,* 811 N.E.2d 404, 411 (Ind.Ct.App.2004). The ordinary rules of statutory construction apply in interpreting the language of a zoning ordinance. The trial court identified three potential ambiguities in section 21 of the Brown County Zoning Ordinance. First, the ordinance defines "plat" as a "map or chart that shows a division of land and is intended to be filed for record." Section 21(C) of the ordinance states that the procedure for approval of a PUD shall generally conform to the procedure for a

major subdivision but the PUD procedures should be interpreted to "either supersede or [be in addition] to the requirements for a Major Subdivision." Section 14(B)(9) of the ordinance addressing the procedures for approval of a major subdivision, requires a copy of the approved "plat" to be recorded in the office of the Brown County Recorder. The Plan Commission and March argue that this language does not require the recording of the Story PUD and its conditions. In their view, only if the PUD and its conditions are intended to be used as a secondary plat for subdivision purposes must it be recorded. In this case, the only approvals sought or granted were PUD zoning and site plan approvals. Platting or re-platting for subdivision purposes was neither proposed nor approved. Once again, the agency's construction of its own ordinance is entitled to deference.

The second alleged source of ambiguity is that section 21(C)(2)(3) of the ordinance provides that the Plan Commission "may impose any reasonable conditions upon its approval, including the recording of covenants." The Plan Commission contends even if this provision imposes a recording requirement, it does not make the effectiveness of the condition contingent on recording. We agree with the trial court that the meaning of this ordinance is unclear. Specifically, it may be read to imply that "covenants" must be recorded. However, as the Plan Commission observes, it does not say that in so many words, and can be taken to mean only that the Commission may in its discretion require recording of covenants.

Last, section 21(C)(3)(1)(a) of the ordinance states that the requirement that "approval of a detailed site plan shall be obtained within one year after approval of the Primary Plat" applies only to the " 'Approved Detailed Planned Unit Development' " and "final platting for recording

purposes of all or an appropriate part of the [PUD] may be undertaken in sections or phases at a later time." Whether section 21(C)(3)(1) makes PUD approval and platting for recording purposes two different processes is also unclear. "When the legislature enacts a statute in derogation of the common law, this Court presumes that the legislature is aware of the common law, and does not intend to make any change therein beyond what it declares either in express terms or by unmistakable implication." *Dunson v. Dunson,* 769 N.E.2d 1120, 1124 (Ind.2002). PUD ordinances, being in derogation of common law property rights, should, whenever ambiguous, be construed in favor of the property owner. *T.W. Thom Constr. v. City of Jeffersonville,* 721 N.E.2d 319, 325 (Ind.Ct. App.1999) ("[A]s a general rule, zoning ordinances limit the free use of property, are in derogation of the common law and must be strictly construed. But this rule cannot override the specific language of an otherwise valid and unambiguous ordinance.").

We agree with the trial court that the ordinance is less than clear whether conditions, if imposed, are to be recorded. However, in view of the resolution of the notice issue in Part I.D, that issue is not material in this case. At most the ordinance recording requirement is necessary to give notice of the conditions to third parties, and it is not necessary to make the condition effective as to the original applicant or those with notice. B & B had actual notice of the PUD designation, and therefore was on inquiry notice of the specific terms of the conditions. The County may wish to amend its ordinance, or routinely record PUD designations and conditions to avoid these issues in the future, but the ambiguity identified by the trial court and failure to meet a recording re-

quirement under the ordinance is immaterial in this case.

### III. Equitable Estoppel

▮▮▮ B & B argues that since it applied for and received permits for the development of the Story Property and has expended a large sum of money on improvements that the government is now estopped from enforcing the PUD conditions.

▮▮▮ The party claiming equitable estoppel must show its "(1) lack of knowledge and of the means of knowledge as to the facts in question, (2) reliance upon the conduct of the party estopped, and (3) action based thereon of such a character as to change his position prejudicially." *City of Crown Point v. Lake County*, 510 N.E.2d 684, 687 (Ind.1987). As a general rule, equitable estoppel will not be applied against governmental authorities. *Id.* Our courts have been "hesitant to allow an estoppel in those cases where the party claiming to have been ignorant of the facts had access to the correct information." *Cablevision of Chicago v. Colby Cable Corp.*, 417 N.E.2d 348, 355 (Ind.Ct.App. 1981). The State will not be estopped in the absence of clear evidence that its agents made representations upon which the party asserting estoppel relied. *Indiana Dep't of Envtl. Mgmt. v. Conard*, 614 N.E.2d 916, 921 (Ind.1993). However, "estoppel may be appropriate where the party asserting estoppel has detrimentally relied on the governmental entity's affirmative assertion or on its silence where there was a duty to speak." *Equicor Dev. v. Westfield–Washington Township*, 758 N.E.2d 34, 39 (Ind.2001). In *Equicor*, Equicor sought approval of a plat, and the Plan Commission when reviewing the application made suggestions in the plat, but was silent as to any parking issue. Subsequently, the Plan Commission at the last moment attempted to deny the plat be-

cause of a formal defect based on the failure to designate certain parking spaces even though adjacent parking was in fact in place. This Court held that estoppel was appropriate because the Plan Commission failed to object timely to the designate spaces. *Id.* at 39–40.

▮▮ The party claiming estoppel has the burden to show all facts necessary to establish it. *Conard*, 614 N.E.2d at 921; *Johnson v. Payne*, 549 N.E.2d 48, 53 (Ind. Ct.App.1990). B & B, as the proponent, has the burden of establishing estoppel and has not met either the first or second element of this claim. As discussed in Part I.D., B & B did have actual notice of the PUD designation and was therefore on inquiry notice of possible conditions imposed on the approval. Thus, B & B's estoppel argument relies solely on the Plan Commission's actions in reviewing and issuing a building permit and its approval of a septic system. B & B contends that its application for the building permit detailed its intent to convert the Story Property into a bar and grill. Taking these facts in a light most favorable to B & B, B & B fails to show that the government made misrepresentations upon which B & B detrimentally relied. B & B does not claim affirmative statement to the effect that the PUD imposed no conditions, and claims no reliance on any express statements by the Plan Commission officer. The addition of a septic system was not inconsistent with the Story PUD plan, and the Plan Commission's approval of the permit without questioning the intent to use the property as a bar and grill does not relieve B & B of its duty to abide by the conditions contained in the PUD. One cannot estop the local zoning authority from enforcing a specific prohibition (for example no loud music) by relying on a generalized objective (authority knew of B & B's intention to operate a bar and grill) listed in an

application for a permit (building and septic tank approval).

## Conclusion

The PUD conditions are valid and enforceable against B & B because it had actual notice of the PUD designation and was on inquiry notice of the conditions. The Plan Commission is not estopped from enforcing the conditions. This case is remanded for further proceedings consistent with this opinion.

SHEPARD, C.J., and DICKSON, SULLIVAN, and RUCKER, JJ. concur.